677 A.2d 1078

Jonathan H. SCOTT

v.

STATE of Maryland.

No. 1195, Sept. Term, 1995.

Court of Special Appeals of Maryland.

June 13, 1996.

Jonathan H. Scott, Olney, pro se.

Devy Patterson Russell, Asst. Atty., Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before BISHOP, FISCHER and HARRELL, JJ.

BISHOP, Judge.

In the course of conducting proceedings on a mechanic's lien petition brought by a third party, Judge J. James McKenna of the Circuit Court for Montgomery County held appellant, Jonathan Scott, in criminal contempt of court and sentenced him to thirty days in jail. Appellant noted a timely appeal to this Court.

## ISSUES

Appellant raises six issues on appeal, which we reorder and rephrase:

I. Did the trial judge commit reversible error when he ruled that appellant's alleged contempt was direct rather than constructive?

II. Did the trial judge violate appellant's due process rights, and thus commit reversible error, when he failed to recuse himself from the proceedings?

III. Is there sufficient evidence in the record to support a finding that appellant committed a criminal contempt of court?

IV. Did the trial judge's written order of contempt violate the requirements of Rule P3?

V. Did the trial judge commit reversible error when he ruled that appellant was not entitled to a jury trial?

VI. Did the contempt proceedings against appellant violate the U.S. Constitution's bar against double jeopardy?

## FACTS

### A. The Underlying Litigation

This case began when a third party, Barrons Enterprises, Inc., filed a complaint against appellant in the Circuit Court

for Montgomery County in December, 1994; the complaint alleged that appellant owed Barrons money and asked that a mechanic's lien be established on appellant's property. As a result of Barrons's complaint, the circuit court issued a show cause order directing that 1) appellant and his wife file either an answer or a counter-affidavit by February 16, 1995, and 2) all parties appear for a hearing on the matter on February 21, 1995.

On February 16, 1995, appellant filed an answer and a motion to dismiss Barrons's mechanic's lien petition. The answer contained a "Certificate of Mailing," which stated that it had been mailed to Barrons's lawyer, Alan Fishbein, on February 16, 1995.

### B. The February 21, 1995 Hearing

At the February 21, 1995 hearing, presided over by Judge McKenna, Mr. Fishbein appeared on behalf of Barrons, and appellant represented himself. Shortly after the beginning of the proceeding, Mr. Fishbein informed Judge McKenna that he had not yet received a copy of either appellant's answer or his motion to dismiss. Judge McKenna asked appellant if he had an extra copy of the pleadings, and appellant responded as follows:

MR. SCOTT: I do have an extra copy. I did mail a copy on the 16th of February to Mr. Fishbein at his Ellicott City, Maryland address.

Appellant also told Judge McKenna that he had given a copy of the pleadings to Mr. Fishbein that day. Mr. Fishbein objected to proceeding with the hearing that day on the ground that he would need discovery from appellant in order to respond appropriately. Judge McKenna agreed with Mr. Fishbein, and the hearing was postponed until April 20, 1995.

Before adjourning, appellant informed the court that he had with him all the documents he needed to demonstrate that the mechanic's lien petition should be dismissed. Judge McKenna responded as follows:

THE COURT: Maybe you can get it done in quicker time than [two months]. It may be that he will dismiss this whole thing. I don't know, but I just want to give him enough time to perfect it ... I don't know, but it may behoove you, Mr. Scott, to take time and chat with counsel here before you leave here today. Okay?

## C. Activities Between Hearings

In his brief, appellant concedes that, after the hearing ended, while walking to the elevator, he refused a request on the part of Mr. Fishbein to relinquish the documents to which he referred at the end of the hearing. Appellant also concedes, in his brief, that he told Mr. Fishbein that if he wanted those documents, "he knew how to get [them]." At oral argument, however, appellant informed us that he refused to relinquish the documents because of Mr. Fishbein's belligerent attitude.

On February 23, 1995, two days after the hearing, Mr. Fishbein received, at his office, a copy of appellant's answer and motion to dismiss; the postmark on the envelope was dated February 21. Because of the postmark on the envelope, Mr. Fishbein concluded that appellant mailed his pleadings on February 21, 1995, and not on February 16, 1995. On March 6, 1995, Mr. Fishbein filed a motion to strike both appellant's answer and appellant's motion to dismiss on the ground that: 1) appellant misrepresented to the court the date on which he mailed his pleadings to Mr. Fishbein; and 2) appellant's motion to dismiss did not have a certificate of service.

In order to take discovery, Mr. Fishbein scheduled appellant for a deposition on April 10, 1995; appellant, however, failed to appear at the deposition. Accordingly, on April 12, 1995, Mr. Fishbein filed a motion for sanctions against appellant.

## D. The April 20, 1995 Hearing

The April 20, 1995 hearing, which was also presided over by Judge McKenna, commenced with a recitation, by Mr. Fish-

bein, of the events that occurred after the February 21 hearing. Mr. Fishbein first reminded the court about both appellant's statement, made in open court on February 21, that he had mailed his pleadings to Mr. Fishbein on February 16, and appellant's certificate of service on his answer, certifying that it had been mailed on February 16. Mr. Fishbein then related appellant's refusal to relinquish documents in the hallway after the February hearing. Mr. Fishbein also told the court about his receipt of appellant's pleadings on February 23 and showed Judge McKenna the February 21 postmark on the envelope carrying those pleadings. Finally, Mr. Fishbein recounted both his attempt to take appellant's deposition and appellant's failure to appear for that deposition.

After hearing from Mr. Fishbein, Judge McKenna asked appellant's attorney, Lawrence F. Regan, Jr., for his input on the matter. Mr. Regan responded that, although he had represented both appellant and appellant's corporation in other, related matters, he had not become involved in the litigation with Barrons until the day before, and therefore had not had an opportunity to examine carefully the motions filed against appellant. Judge McKenna responded by listing some of the motions that had been filed against appellant, and Mr. Regan told the court that he wanted to address first Mr. Fishbein's motion to strike. Shortly after Mr. Regan began speaking, however, Judge McKenna cut him off and displayed his displeasure with appellant's apparent misstatement about the date he had mailed his pleadings:

THE COURT: Let me ask you this: Do you think I ought to take at all into account an apparent bald-face lie by your client to me in open court?

Should I do anything about that or should I just simply sit back and say, well, that is the way it goes, assuming that that is correct.

Mr. Regan began to respond, but was again cut off by Judge McKenna, who turned his attention to appellant and said:

THE COURT: Do you want to step forward, sir? You can step forward because **if you feel like your goose is about**

**to get cooked, you are on the right track,** and I would suggest that if you step forward that you remain silent until asked to be spoken to.

(Emphasis added).

After a further exchange between the two lawyers and the court, Judge McKenna granted both the motion for sanctions against appellant and the motion to strike appellant's answer and motion to dismiss. Judge McKenna then turned his attention back to the contempt issue:

THE COURT: Now the question is whether or not I ought to get into the question of having a show cause hearing why [appellant] ought not to be held in criminal contempt of this Court.

Mr. Fishbein, I will hear from you first on that. We can set up a show cause giving him a time and a date when he can come in here and convince me why I ought not to punish him for his past activities.

After hearing from Mr. Fishbein, but before allowing Mr. Regan any input, Judge McKenna decided to issue a show cause order on appellant's alleged contempt:

THE COURT: Okay. Mr. Regan, I am going to give you an opportunity to represent your client again, but it is going to be at a show cause hearing.

As I said, [appellant] may have made a very, very, very serious mistake or maybe he didn't. That is why we have show cause hearings. Maybe there has all been a big misunderstanding, and if there has been a misunderstanding, well, then he doesn't have anything to worry about, but if there hasn't been a misunderstanding and if he may think to himself, well, the way to get out of this is to add another lie to a series of lies that have already been set, that would be compounding the mistake because if that lie happens to be under oath, why we have a name for that: We call it perjury, and then that gets involved in the entire criminal process.

Subsequently, Judge McKenna issued an order setting up a show cause hearing on May 9, 1995.

### E. The May 9, 1995 Hearing

The May 9 hearing commenced with a recitation by Mr. Fishbein of the events of the case. In particular, Mr. Fishbein emphasized the following facts: that appellant filed his pleadings on February 16, 1995; that appellant put a certificate of service on his answer stating that the pleadings had been sent to Mr. Fishbein on February 16, 1995; that appellant told Judge McKenna, in open court, that he mailed the pleadings on February 16, 1995; that Mr. Fishbein's law office received appellant's pleadings on February 23, 1995; and that the envelope carrying those pleadings had a February 21, 1995 date stamp on it.

When Mr. Fishbein finished his summary of the facts pertaining to appellant's alleged misstatements about the date on which he mailed his pleadings, Judge McKenna asked whether a contempt citation was also appropriate for appellant's failure to appear for his deposition:

THE COURT: That, I take it, explains that portion of the show cause that you put together for me which talks about statements. You don't get into the—the show cause was signed on the 24th of April, but it does not talk about—we never have addressed the issue of his failure to show up for the deposition.

Mr. Fishbein explained that Judge McKenna had already granted relief for appellant's failure to come to his deposition by allowing Mr. Fishbein's motion to strike and motion for sanctions. Judge McKenna responded by saying, "It seems to me that I said at that time that I wanted to address the issue of contempt." Mr. Fishbein repeated that he thought that relief for appellant's failure to appear for the deposition had already been granted, and a contempt citation was not necessary. Judge McKenna agreed, and thus made it clear that appellant was being charged with contempt only for his alleged misstatements to the court about the date he mailed his pleadings to Mr. Fishbein:

THE COURT: Okay. There you have it, and that is what brings us here today. Mr. Regan, I will hear from you.

Unless there be any doubt about it, the specific items which, although you are right it isn't particularly clear from the show cause, but the specific items that we are talking about is the allegation that your client on February 21 looked me in the eye and told me that he had done certain acts which he had not done, allegedly.

Mr. Regan responded by first asking for a jury trial, and he and Judge McKenna began discussing that issue. In the middle of their colloquy, however, Judge McKenna turned his attention to appellant, and the following exchange occurred:

THE COURT: **I can tell you that I feel rather strongly about people who come in here and lie, eyeball to eyeball with me, such as the guy sitting next to you staring at me as if he feels that he is a tough guy.**

MR. REGAN: Your Honor, I told him to have a poker face today. I don't think that that is applicable. That is my fault.

THE COURT: If he decides that he wants to and let the record reflect that it is my view of looking at the visage of Mr. Scott that he feels that somehow or another he is going to be able to stare this member of the bench down and that would be a tricky business, at best, from his point of view. **To say that I am not pleased with him is an understatement.**

MR. REGAN: Your Honor, we have not pled guilty to this.

THE COURT: I know you haven't pled guilty to it, but **I know what went on, though.**

Mr. Regan then returned to the issue of whether appellant was entitled to a jury trial. Judge McKenna asked Mr. Regan what his authority was for appellant's entitlement to a jury trial, and Mr. Regan said that he would have to go back and find some. Mr. Regan then asked for a continuance on the ground that 1) he had not had an opportunity to hear a tape of the February 21, 1995 hearing, and 2) he needed to find witnesses to testify on behalf of appellant. Judge McKenna agreed to a continuance until June 7, 1995 and asked both parties to file memoranda on the issue of whether appellant's

alleged contempt was direct or constructive. Before adjourning the hearing, however, Judge McKenna again made clear his displeasure with appellant:

THE COURT: Fine. Suffice to say, gentlemen, that because of the alleged—let's put it this way. There are few things about which I get exercised. I mean, most of the time I will let things slide.

I think it is fairly well known in the legal community that I try to be reasonable and try to be fair and try to settle cases and that sort of thing, but **if there is one thing that I will follow somebody until hell freezes over is if that person lies to me. Then I will pursue it like an avenging angel, and that is what is going on right now.**

This is the first time in the nine and a half years that I have been on the bench that this has happened, I am happy to say, but I intend to pursue it.

(Emphasis added).

### F. The June 7, 1995 Hearing

Judge McKenna commenced the June 7 proceeding by hearing argument from Mr. Regan and Mr. Fishbein on the question of whether appellant's alleged contempt was direct or constructive. After a significant amount of debate, Judge McKenna ruled that the alleged contempt was direct and that he was therefore able to issue a ruling on the matter.

Judge McKenna next asked for opening statements from both attorneys. Mr. Fishbein went first, and recounted both the February 21 hearing and the events which occurred in the aftermath of that hearing. When he finished, Judge McKenna identified the actions on which appellant's contempt charge was based:

THE COURT: I think the issues are quite narrow or the issues are quite narrow [sic]. The allegation of contempt or not is that on the date of February 21, 1995, [appellant] lied to me when he told me that he had already placed these documents in the mail. That is the long of it and the short of it.

Judge McKenna then allowed Mr. Regan to make an opening statement. Among other things, Mr. Regan explained that appellant had mailed his pleadings to Mr. Fishbein on February 18, 1995, a Saturday, and that February 20, 1995, which was the following Monday, was President's Day; according to Mr. Regan, the fact that a federal holiday fell on February 20 explained the February 21, 1995 postmark on the envelope carrying appellant's pleadings.

After the opening statements, Judge McKenna proceeded to introduce evidence into the record. He first informed Mr. Fishbein that his actual testimony was unnecessary because his opening statement was sufficient to impart the relevant events of the case. Judge McKenna then introduced into evidence, as "Court's Exhibit Number 1," the pleadings which appellant sent to Mr. Fishbein and the envelope carrying those pleadings. Finally, Judge McKenna introduced, as "Court's Exhibit Number 2," the tape of the February 21 proceeding, and played the tape for the record. When the tape had finished playing, Judge McKenna made some comments about it, asked Mr. Fishbein if he had anything to add, and made the following statement:

THE COURT: All right, thank you. **In effect, the prosecution rests.** Mr. Regan, the ball is now over in your client's case.

Mr. Regan's first witness was appellant's brother, David Scott. Mr. Scott ascended the witness stand and took the witness's oath, but before he was able to begin testifying, Judge McKenna intervened and the following ensued:

THE COURT: Now, let me step in here. Mr. Scott, I want to tell you a couple of things. You are now under oath. I am not prejudging your testimony whatsoever, but I do want to let you know that in this State of Maryland we have a crime which is known as that of perjury.

What it means is lying under oath, and what it means is it is a felony. I don't know what the maximum is. I believe it is 10 years and it may be 20. I am not sure, but it is at least 10 years in the penitentiary. It is taken very, very

seriously by the courts, and it is taken especially seriously by this member of the bench.

I don't know what you are about to say, but I do think that it is important for you to know the ramifications. If it turns out that whatever you say in conjunction with whatever purportedly your brother is going to say that in my view there is reason to believe that you have committed perjury in this courtroom, I intend to send the entire transcript of this matter down to the State's Attorney's office on the fifth floor of this building for them to look into the question of whether or not there has been perjury that has been committed on this matter of the bench.

Sir, I just want you to note that. I don't want anybody to kind of get sandbagged here in this courtroom. Armed with that knowledge, armed with the notion that there is that possibility, do you understand what I have to say? I think I made simple declarative sentences, and they weren't complicated, were they?

THE WITNESS: No.

THE COURT: Fine. All right, you may proceed.

Mr. Scott testified that on February 15, 1995 he arrived at home to find appellant working on his computer. According to Mr. Scott, appellant gave him a stack of papers and a letter and told him that, the next day, he was to file one set of papers with the court and mail the letter. Mr. Scott testified that on February 16, 1995, he took the papers down to the clerk's office of the Montgomery County Circuit Court, filed one set, and received a date-stamped set for himself; he also testified that he never mailed the letter.

Appellant was the next to testify, and Judge McKenna addressed him immediately after he stated his name and address:

THE COURT: Excuse me. I am going to take over at this point.

MR. REGAN: Okay.

THE COURT: Mr. Scott, you were here, were you not, when your brother took the stand a few moments ago?

THE WITNESS: Yes, I was.

THE COURT: And you heard what I said to him about the issue of perjury, did you not?

THE WITNESS: Clearly.

THE COURT: Do you have any questions about what I said to him about perjury?

THE WITNESS: No, I do not.

THE COURT: Do you know that the same thing applies to you?

THE WITNESS: Yes, I do.

THE COURT: Fine, and you want to proceed?

THE WITNESS: Yes, sir.

THE COURT: Fine. He wants to proceed.

On direct examination, appellant testified to the following: that on February 15, 1995, he went to his brother David's house to complete paperwork that was due in connection with the Barrons litigation; that he had a new job at that point which was taking up much of his time, and he could not afford an attorney; that he prepared all of the pleadings in the case himself; that he used the pleadings of others as a model for the ones he prepared; that he finished the pleadings on the night of February 15, 1995, placed them in a stack, and put one copy in a letter addressed to Mr. Fishbein; that he gave the pleadings and the letter to his brother, David, with instructions to file the pleadings and mail the letter the next day; that on February 16, 1995, he went to work in Washington, D.C., and did not handle the pleadings or the letter that day; that he went to David Scott's house next on February 18, 1995, a Saturday, and found the letter to Mr. Fishbein lying on a table; that he promptly mailed the letter from his parents' house after he found it; and that he had no intention to deceive Judge McKenna during the February 21, 1995 hearing. In explaining his conduct during the February hearing, appellant testified:

I got to court and I, of course, was nervous as to when the case was going to be called. I listened to several other

cases, and I tried to ascertain how I was to behave when I came before the judge and I determined that I should try to be as brief as I could be and as concise as I could be without getting to [sic] long winded.

So when they called the case, I came up and presented my case. Then when Mr. Fishbein tried to—I believe he was trying to infer that I hadn't mailed a copy of that, and I did, indeed, tell in response to Mr. Fishbein's claiming that I never mailed it that yes, I did mail it on the 16th.

Well, when we were running the company David was our mailman, so to speak, so when I gave it to him I considered it handled.

On cross-examination, which was conducted by Mr. Fishbein, the following exchange occurred regarding appellant's state of mind during the February 21 hearing:

Q You say that you found [the letter] in your brother's home on the 18th, on Saturday, and mailed it from Ashton near your parents' home. Is that correct?

A I mailed it at my parents' home.

Q You did not tell Judge McKenna on February 21, 1995 that you mailed it from your parents' home on the 18th. You told Judge McKenna that you mailed it to me in Ellicott City on February 16, 1995. Isn't that correct?

A That is correct.

Q You knew at that time that you hadn't mailed it on the 16th of February 1995. Isn't that correct, sir?

A I don't recall that. I recall that at that time.

Q You mean to tell me that you found this letter, so you say, on the 16th of February of 1995 and mailed it then and you didn't remember three days later in open court that you hadn't mailed it on the 16th, you had mailed it on Saturday, the 18th of February, 1995? Is that what you're telling me?

\* \* \* \* \* \*

THE WITNESS: A lot of things have happened to me. A lot of things everyday that these days I don't remember because it is coming so fast and so furious.

Q: Mr. Scott, you knew there was an issue when we were in court on February 21, 1995 that I hadn't seen any of the pleadings. Do you remember that issue?

A: I remember that.

Q: You didn't tell the judge, gee, judge, I am sorry. My brother was supposed to mail it on the 16th. He didn't mail it. I learned about it on the 18th. I mailed it on it [sic] to Mr. Fishbein and that is why he doesn't have a copy yet. You didn't say that, did you?

A: I didn't remember that.

After appellant had finished testifying, Mr. Regan moved to dismiss the case on the ground that not enough evidence had been adduced to find, beyond a reasonable doubt, that appellant had committed a contempt of court. Judge McKenna rejected that argument, and ruled that appellant had committed a criminal contempt of court. After hearing allocution from both lawyers—Mr. Regan asked for leniency, while Mr. Fishbein asked that appellant be given six months in jail—Judge McKenna sentenced appellant to thirty days in jail. This appeal followed.

## DISCUSSION

### I. Direct versus Constructive Contempt

■ Appellant argues that Judge McKenna erred by ruling that his putative contempt was direct rather than constructive. We agree.

■ Rule P1.a. defines direct contempt as "a contempt committed in the presence of the court, or so near to the court as to interrupt its proceedings." By contrast, Rule P1.b. defines constructive contempt as "a contempt which was not committed in the presence of the court, or so near to the court as to interrupt its proceedings." Under prevailing case law interpreting the meaning of "in the presence of the court, or so near to the court as to interrupt its proceedings," a contempt is not direct if the trial judge does not have personal knowledge of all of the relevant facts; in such a case—where

the judge must look at extrinsic evidence to determine that a contempt has been committed—the contempt is constructive rather than direct. *See Dorsey v. State*, 295 Md. 217, 223–26, 454 A.2d 353 (1983); *State v. Roll and Scholl*, 267 Md. 714, 732–36, 298 A.2d 867 (1973); *A.V. Laurins & Co. v. Prince George's County*, 46 Md.App. 548, 562–67, 420 A.2d 982 (1980); *Pearson v. State*, 28 Md.App. 464, 480–84, 347 A.2d 239 (1975). *See also* 17 C.J.S. *Contempt*, §§ 3, 4, pgs. 8–10 (1963). Because Judge McKenna did not have personal knowledge of all of the relevant facts (he had to look at extraneous evidence to determine when appellant actually mailed his responsive pleadings) appellant's putative contempt was constructive rather than direct.

As noted, our distinction between direct and constructive contempt is supported by both the language and results of *Dorsey, Roll and Scholl, A.V. Laurins,* and *Pearson*. In *Roll and Scholl*, appellants were held by a trial court to be in direct contempt for refusing to testify before a grand jury. On appeal, appellants challenged the trial court's determination that their contempt was direct, rather than constructive.

Beginning its discussion of the issue, the Court of Appeals wrote that:

> The real problem here is to determine what the words 'in the presence of the court, or so near to the court as to interrupt its proceedings' as used in Rule P1 a and b mean. In connection with this it must be remembered that direct contempts may be summarily punished. The power to immediately and summarily hold a person in contempt is awesome and abuses of it must be guarded against.

*Roll and Scholl*, 267 Md. at 732, 298 A.2d 867 (citations omitted). The Court then went on to note certain Supreme Court cases that enunciate the principle that summary contempt proceedings should only be used in exceptional cases:

> The United States Supreme Court has often expressed the opinion that a summary contempt proceeding should be the exceptional case. Such proceedings are only proper in cases where the action of the alleged contemnor poses an

open, serious threat to orderly procedure that instant, and summary punishment, as distinguished from due and deliberate procedures, is necessary. In other words, direct contempt procedures are designed to fill the need for immediate vindication of the dignity of the court. As the Supreme Court stated in *Johnson v. Mississippi* [403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971)] 'instant action may be necessary where the misbehavior is in the presence of the judge or is known to him, and where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court.' But, it is recognized that at times immediate action taken against an attorney guilty of contempt is likely to prejudice his client. If this is the case, it is best to wait until the end of the trial and a more deliberate path followed. And, while not required, when a judge waits until the end of the trial, it is generally wise to ask a fellow judge to rule on the nature of the conduct of the contemnor if it has in it elements of personal attack upon the judge. The judge must banish personal impulses to reprisal, or to vent his spleen.

*Id.* at 733, 298 A.2d 867 (citations omitted). Finally, the Court delineated the differences between direct and constructive contempt and held that appellants' contempt was constructive:

We think the content and meaning of the phrase 'in the presence of the court' as used in Rule P1 a and the procedure sanctioned by Rule P3 for conducting a direct contempt proceeding must be framed against a constitutional background. When this is done, the picture is clear. A direct contempt occurs when the actions of the contemnor interrupt the order of the courtroom and interfere with the conduct of business. When such disruption occurs within the sensory perception of a presiding judge he will have a sufficient knowledge of the contemptuous act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony.

When, as in the case here, the judge does not have personal knowledge of the facts and must learn of them

totally from others, direct contempt proceedings are not authorized. The reason such proceedings are not permitted is that there is no need for summarily disposing of an alleged contempt when the behavior of the accused is not personally known to the judge or does not occur so near to the court as to interrupt its proceedings.

*Id.* at 734, 298 A.2d 867.

In *Dorsey*, the appellants, while awaiting trial in a cell immediately adjacent to a courtroom, began making a significant amount of noise in their cell. The trial judge conducting proceedings in the adjoining courtroom was disturbed by the noise and cited appellants for constructive contempt. After notice and a hearing before another judge, appellants were found to be in contempt of court. On appeal, appellants argued that their contempt was actually direct, not constructive, and that the lower court was therefore deprived of jurisdiction to hear their case.

The Court of Appeals started its discussion of the issue by quoting some of the above language from *Roll and Scholl*. In order to clarify that language, the Court quoted from two other cases—*Ex Parte L.T. Wisdom*, 223 Miss. 865, 79 So.2d 523 (1955), and *Middlebrook v. State*, 43 Conn. 257 (1876). The language from *Wisdom*, which attempted to describe a constructive contempt, reads as follows:

Where witnesses are necessary to prove the acts of contempt, although the contempt may have been committed technically "in the presence of the court," but not within the sight or hearing of the presiding judge, we think that notice should be given to the accused, and a reasonable opportunity afforded to him to prepare his defense.

*Dorsey*, 295 Md. at 224–25, 454 A.2d 353 (quoting *Wisdom*, 223 Miss. at 870, 79 So.2d 523). The language from *Middlebrook*, which described a direct contempt, reads as follows:

The judicial eye witnessed the act, the judicial mind comprehended all the circumstances of aggravation, provocation, or mitigation; and the fact being thus judicially established, it

only remained for the judicial arm to inflict proper punishment.

*Id.* at 225, 454 A.2d 353 (quoting *Middlebrook,* 43 Conn. at 269). Given this language, the Court of Appeals held that appellants' contempt was constructive, rather than direct:

Although the contempt here was in the presence of the court from the standpoint of its being within the hearing of the court and its having actually interrupted the court's proceedings, it was indirect in the sense that the trial judge was not able to immediately identify the culprits. Testimony on the subject was necessary.

*Id.* at 226, 454 A.2d 353.

In *A.V. Laurins,* appellants were held in direct contempt of court for failing to appear in court after being subpoenaed. On appeal, appellants argued that their contempt was constructive rather than direct. This Court began its discussion of the issue by quoting extensively from *Roll and Scholl.* We then went on to hold that appellants' contempt was constructive rather than direct:

As in *Roll,* so in the present case, we find nothing to indicate that the Circuit Court was interrupted by the appellants' absence. To the contrary, the trial proceeded without them after the appellee's counsel stated a desire to go forward with the trial. Additionally, the record does not show that the chancellor had personal knowledge of the facts which might have explained or even excused appellants' absence.

46 Md.App. at 563; 420 A.2d 982.

In *Pearson,* appellant was being tried for violations of laws governing controlled dangerous substances. During a lunch break in the trial, appellant disappeared, and the trial court found him to be in direct contempt of court. On appeal, appellant argued that his contempt was constructive rather than direct.

In its discussion of the issue, this Court quoted extensively from *Roll and Scholl.* We then went on to hold that appellant's contempt was constructive, rather than direct:

The question is, what kind of contempt would such action constitute. Viewed in light of the Court of Appeals' construction of the language of Rule P3, §§ a and b, the offensive act of Pearson, assuming it was voluntary, was not a direct contempt. His failure to return to the courtroom after the luncheon recess did not, in fact, interrupt the order of the courtroom and interfere with the conduct of business. The trial promptly proceeded to verdict, without him as authorized by Rule 775, and without prejudice to the State, claimed or existent. The behavior of Pearson, therefore, constituted a constructive contempt.

*Pearson*, 28 Md.App. at 483, 347 A.2d 239.

These cases lead us to the following conclusions regarding direct and constructive contempt: if the trial judge, while presiding over his courtroom, is able to obtain personal knowledge of all of the relevant facts, the contempt is direct; by contrast, if the trial judge, while presiding over his courtroom, is not able to obtain personal knowledge of all of the relevant facts, and must rely on extrinsic evidence, the contempt is constructive. Because Judge McKenna did not have personal knowledge of all of the relevant facts, appellant's putative contempt in the case *sub judice* was constructive rather than direct, and the procedures outlined in Rule P4 should have been used. The actual evidence in this case did not lend itself to a direct contempt.

## II. Recusal

Appellant also argues that Judge McKenna committed reversible error when he failed to recuse himself. We agree.

As an initial matter, we wish to deal with the State's contention that appellant never raised this issue below, and is therefore barred from raising it in this appeal. We agree that neither appellant nor his lawyer ever raised this matter below, apart from requesting that the procedural protections of Rule P4 be instituted, and that the issue is therefore unpreserved. A reason for this failure may have had to do with the actions of Judge McKenna himself. Judge McKenna acted very

belligerently toward appellant; and Mr. Regan may have failed to ask Judge McKenna to recuse himself because he did not want to provoke further wrath. In *Suggs v. State*, 87 Md.App. 250, 589 A.2d 551 (1991), with respect to a defendant's lawyer's failure to object to prejudicial remarks made by the trial judge, we stated:

> It can be inferred from the record that appellant's counsel did not object because he reasonably feared that he would personally incur the greater wrath of the already outraged trial judge. Indeed, by trying to appease the court, defense counsel may well have acted in his client's best interest.

*Id.* at 258, 589 A.2d 551. Because of the importance of allowing a trial judge to rule on the issue of his recusal, a party should raise that issue in the lower court proceedings, unless very extenuating circumstances exist. Such extenuating circumstances were not present in this case, and appellant's failure to raise the question below means it is not preserved for our review. Nevertheless, we will exercise our discretion and address the issue. In *County Council v. Offen*, 334 Md. 499, 639 A.2d 1070 (1994), the Court of Appeals referred to "a limited category of issues, in addition to jurisdiction, which an appellate court ordinarily will address even though they were not raised by a party." *Id.* at 509, 639 A.2d 1070 (quoting *Moats v. City of Hagerstown*, 324 Md. 519, 525, 597 A.2d 972 (1991)). We believe this is one of those issues.

▪▪▪ In Maryland, an accused has the right to a trial in which the judge: 1) is impartial and disinterested, and 2) has the appearance of being impartial and disinterested. *Jefferson–El v. State*, 330 Md. 99, 105–08, 622 A.2d 737 (1993). A party who wishes to show that a judge is not impartial or disinterested has a high burden to meet. In Maryland, "there is a strong presumption ... that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Id.* at 107, 622 A.2d 737. "To overcome the presumption of impartiality, the party requesting recusal must prove that the trial judge has 'a personal bias or prejudice' concerning him or 'personal knowledge of disputed evidentiary

facts concerning the proceedings.'" *Id.* Further, "[o]nly bias, prejudice, or knowledge derived from an extrajudicial source is 'personal.'" *Id.*

 A party wishing to show that a judge does not have the appearance of impartiality, however, has a slightly lesser burden. Appearance of disinterestedness or impartiality is determined by "examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Id.* at 108, 622 A.2d 737 (citing *Boyd v. State*, 321 Md. 69, 86, 581 A.2d 1 (1990)).

In the case *sub judice*, we believe that Judge McKenna should have recused himself from presiding over appellant's contempt proceeding on the ground that he did not have the appearance of impartiality. From the moment he was presented evidence that appellant may have lied to him, Judge McKenna exhibited a hostile attitude toward appellant. In particular, Judge McKenna made three separate statements, before the June 7 contempt hearing, that demonstrated a lack of impartiality. The first occurred during the April 20 hearing, after Mr. Fishbein recited the events that had occurred since the February 21 proceeding. Mr. Regan was attempting to respond on behalf of his client, when Judge McKenna turned his attention to appellant and said:

THE COURT: Do you want to step forward, sir? You can step forward because if you feel like your goose is about to get cooked, you are on the right track, and I would suggest that if you step forward that you remain silent until asked to be spoken to.

The second occurred in the middle of the May 9 hearing, just after Mr. Regan asked the court for a jury trial. Judge McKenna turned his attention to appellant and the following exchange occurred:

THE COURT: I can tell you that I feel rather strongly about people who come in here and lie, eyeball to eyeball with me, such as the guy sitting next to you staring at me as if he feels that he is a tough guy.

MR. REGAN: Your Honor, I told him to have a poker face today. I don't think that that is applicable. That is my fault.

THE COURT: If he decides that he wants to and let the record reflect that it is my view of looking at the visage of Mr. Scott that he feels that somehow or another he is going to be able to stare this member of the bench down and that would be a tricky business, at best, from his point of view. To say that I am not pleased with him is an understatement.

MR. REGAN: Your Honor, we have not pled guilty to this.

THE COURT: I know you haven't pled guilty to it, but I know what went on though.

The last statement was made at the end of the May 9 hearing, when Judge McKenna made clear his feelings on lying to the court:

THE COURT: I think it is fairly well known in the legal community that I try to be reasonable and try to be fair and try to settle cases and that sort of thing, but if there is one thing that I will follow somebody until hell freezes over is if that person lies to me. Then I will pursue it like an avenging angel, and that is what is going on right now.

At the June 7 contempt hearing, Judge McKenna made further statements, and took other actions, that diminished the appearance of impartiality. For example, during the evidentiary stage of the proceeding, Judge McKenna acted as the prosecutor, introducing evidence against appellant. Further, Judge McKenna made remarks to both David Scott and appellant while they were on the witness stand that suggested that he may have prejudged their credibility.

A reasonable person, knowing these facts, would certainly have recused Judge McKenna from presiding over appellant's contempt hearing on impartiality grounds. Accordingly, Judge McKenna should have recused himself, and his failure to do so is reversible error.

■■■ Although judicial anger is understandable, a judge should not let his displeasure with litigants, witnesses, or lawyers unduly affect his conduct in the courtroom—particularly in a contempt proceeding. In this case, Judge McKenna allowed his anger to get the best of him; as a result, he adopted an unjudicial attitude toward appellant, David Scott, and Mr. Regan. We think it is important to repeat the following admonition of this Court in *Betz v. State*, 99 Md. App. 60, 635 A.2d 77 (1994):

> Many judges have experienced aggravating—sometimes even defiant—conduct on the part of lawyers and others (just as many lawyers, and others, have experienced aggravating conduct on the part of judges), and, in the press of attempting to move dockets and resolve cases fairly and efficiently, the experience can cause instant irritation. Judges, too, are human and have human emotions; they get angry, often for good reason. But, unlike other people, judges have the sovereign power to punish, to deprive persons of their liberty and property, and that alone requires that they restrain their irritation. Punishment for contempt should never be imposed in anger, as an immediate emotionally reflexive response.

Id.

## III. Sufficiency of the Evidence

■■■ Appellant also argues that there is insufficient evidence in the record to support his contempt conviction.

■■■ We begin our discussion of this issue by noting our standard of review, which was set forth by the Court of Appeals in *State v. Raines*, 326 Md. 582, 606 A.2d 265 (1992):

> In reviewing the sufficiency of the evidence to support a criminal conviction, the standard to be applied is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' The appropriate inquiry then is not whether we believe that the evidence at trial established guilt beyond a reasonable doubt; '[i]nstead, the relevant question is whether, after viewing the evidence in

the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' Moreover, when evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the trial court will not be set aside on the evidence unless clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses.

*Id.* at 588–89, 606 A.2d 265 (citations omitted).

 Next, we must establish what constitutes contempt of court. In *Goldsborough v. State,* 12 Md.App. 346, 278 A.2d 623 (1971), this Court defined contempt as follows:

In a narrow sense, a contempt has been defined as a despising of the authority, justice, or dignity of the court; in a more general sense, a person whose conduct tends to bring the authority and administration of the law into disrespect or disregard, interferes with or prejudices parties or their witnesses during litigation, or otherwise tends to impede, embarrass, or obstruct the court in the discharge of its duties, has committed a contempt.

*Id.* at 355, 278 A.2d 623. Further, in *Betz v. State,* 99 Md.App. 60, 635 A.2d 77 (1994), we enunciated the principle that "[c]riminal contempt is not a strict liability offense; willfulness or intent is an essential element." *Id.* at 66, 635 A.2d 77. Accordingly, to be convicted of criminal contempt, a person must 1) engage in activities that bring the authority and administration of the law into disregard, that interfere with or prejudice parties during litigation, or that impede, embarrass, or obstruct the court in the administration of its duties; and 2) intend that his actions have such effects. If both the *actus reus* and the *mens rea* cannot be proven beyond a reasonable doubt, then a conviction for criminal contempt is unwarranted.

In the case *sub judice,* it is uncontroverted that on February 21, 1995 appellant made a statement to the circuit court that was not accurate. Appellant told the court that he mailed his answer and his motion to dismiss to Mr. Fishbein on February 16, 1995; and appellant admits to us, as he did to

Judge McKenna in the contempt proceedings below, that his statement was not correct. Ordinarily, a misstatement to a trial court would be sufficient to satisfy the *actus reus* requirement outlined above. In this case, however, we are unable to determine how appellant's statement was anything other than innocuous. The misstatement did not cause undue delay in the case, and did not cause any prejudice to the party seeking the mechanics' lien. Therefore, it is uncertain whether appellant's misstatement satisfies the *actus reus* requirement for criminal contempt of court.

The bigger problem in this case lies in the proof of appellant's intent. An impartial judge, after reviewing the entire record, could have concluded that appellant made an inadvertent mistake when he stated to Judge McKenna the date on which he mailed his responsive pleadings to Mr. Fishbein. The opposite conclusion apparently drawn by Judge McKenna may well have been the product of the judge's own improperly preconceived view, rather than an objective, impartial consideration of the circumstances.

As noted in § I of this opinion, a judge may not hold a party in direct contempt of court unless he has personal knowledge of all of the circumstances giving rise to the contempt. In this case, Judge McKenna only had personal knowledge of appellant's statement that he mailed the responsive pleading on February 16, 1995. He did not have personal knowledge of any other relevant fact in this case; these included the date appellant mailed his pleading, appellant's unwillingness to cooperate with Mr. Fishbein, and appellant's failure to appear for his deposition. Therefore, we hold that, in the context of the direct contempt proceeding initiated by the judge, the evidence of which Judge McKenna had personal knowledge was insufficient to allow a reasonable factfinder to find that appellant committed a criminal contempt of court.

We believe that an objective factfinder would find that the evidence in this case may well be too weak to support a conviction for constructive criminal contempt.

## IV. Other Issues

Because of the foregoing, we decline to address the other issues raised by appellant.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. MONTGOMERY COUNTY, MARYLAND TO PAY THE COSTS.**