615 A.2d 1182

James Lionel Lambert DYSON

v.

STATE of Maryland.

No. 8, Sept. Term, 1992.

Court of Appeals of Maryland.

Dec. 4, 1992.

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

The defendant complains that the trial judge erred in permitting the introduction of additional evidence after the jury had begun its deliberations, and in denying the defen-

dant the opportunity to cross-examine the witness who provided the additional evidence. The State denies that the nonverbal communication by the witness constituted additional evidence. In the alternative, the State argues that the trial judge did not abuse her discretion in permitting additional evidence, and that the defendant waived his right to cross-examine the witness.

## I.

The victim was awakened at 3:30 a.m. by an intruder who had gained access to her apartment in St. Mary's County. The victim testified that her assailant threatened her with a butcher knife, raped her, and performed other sexual assaults upon her. She said that during the course of the assault, the intruder forced her to drink a large quantity of rum, which caused her to become intoxicated and later to pass out. When she awoke, she obtained a ride to the Patuxent Naval Air Station where she worked, and there reported the assault. She was examined at the base hospital, and the police were summoned.

The victim gave the police a description of her assailant, but the description was apparently not sufficient to focus suspicion upon any individual. The only distinctive feature included in the description was that the assailant had "light colored spots or blotches on his lips." Several weeks later, the victim saw her assailant on the street in Lexington Park, and called the police. Coupling the original description with additional information provided by the victim with respect to the suspect's clothing, the police questioned local residents and merchants and learned that the defendant fit that description. An array of photographs was shown to the victim; she identified the defendant's photograph, in these words:

It looks like him. His lips and his face protrudes like that. He was wearing a cap the last time I saw him. It is difficult with the photograph, but it looks like him. None of the others are him.

After some delay, and following removal of the case from St. Mary's County to Prince George's County, the defendant's trial began on 20 November 1990. From the outset it was clear that the principal attack on the State's case would be the identification of the defendant as the perpetrator. Defense counsel elicited evidence that the only clear view the victim had of the assailant was in the bedroom during the assault, and that it was dark in the bedroom at that time—the only light being that which came from outside street lights through the closed shade of a single window. At all other times, the assailant remained behind the victim, ordering her not to look at him and slapping her on the one occasion she attempted to do so. Although fingerprints were obtained from the scene, few were of comparison quality, and those that were did not match the defendant's prints.

In addition to the extra-judicial photographic identification, the State elicited a positive in-court identification of the defendant by the victim, and offered circumstantial evidence tending to tie the defendant to the crime. The victim testified that the perpetrator had taken money from her purse and had apparently also taken her gold "Orient" wristwatch and a "Sharp" radio, also referred to as a "box". The State proved that the defendant had given a ladies' gold "Orient" watch to Sheila Chase Rogers on 13 May 1988, which she in turn gave to Margaret Kuykendall, who turned it over to the police. When shown the watch, the victim testified it looked like hers, but admitted it had no distinctive features and she could not distinguish it from other watches of that make and model.

With respect to the "Sharp" radio, the State proved that Margaret Kuykendall received it from the defendant in mid-May, 1988, and turned it over to the police. Although the outward appearance of the radio was the same as other "Sharp" radios, the victim testified she could identify it as hers because the indicator needle did not move across the face of the dial when the tuning knob was turned. She explained:

WITNESS: Well, the band on the radio is broken and we took it apart and to get it to work again we had to take it off of the—there's a little red mark that tells you what station it's on.... Well, that no longer moves because we had to disconnect it to tie it together to make it long enough so we could get different stations.

Defense counsel pursued the matter on cross-examination:

Q. Are there any initials of yours on that radio?

A. No, there are not.

Q. Are there any distinctive marks on that radio?

A. If you were to take it apart you can see where we tied the band back together where it moves the—the red line on the front back and forth to wherever the station should be.

Q. Well, when you examined that radio on the stand had you taken that radio apart?

A. No. I turned it on. The line doesn't move. It stays right there. You have to turn this and just guess at wherever the station is.

On redirect-examination the witness spoke of a knot she had tied in the line that is attached to the tuning knob of the radio:

Q. Just briefly, on this radio you mentioned something about bands, tying a band together. What—describe to me a little more what you're talking about when you say tying a band together.

A. It's just a thin line inside of a radio that when you turn the knob for the tuning it turns it, you know, so you would know where to put it on.

Q. Okay.

A. Well, we had to disconnect it from the—the doodad that slides back and forth across the radio ... and tie it together so it would be long enough to tie it together so we could tune the radio.

Q. You mean it's in a knot?

A. Yes, it's in a knot.

Q. Okay. So, in other words, if—if the members of the jury were so inclined to take off the front of this radio and look at the band they would see a knot tied in it?

A. Yeah, but they would have to do it from the back side.

Minutes later, near the end of the victim's testimony, the jury passed a note to the judge. It said: "Can we see inside of radio for verification." The trial judge responded:

Ladies and gentlemen, someone has asked a question about looking at the inside of the radio. When you get this case for your deliberations you will be allowed to consider all of the evidence which is presented and which has been introduced for your inspection.

Examination of the witness was completed without further reference to the radio.

The case was given to the jury for deliberation at 2:00 p.m. on 26 November 1990. At about 6:00 p.m. the jury sent the following note to the judge:

We, the jurors have not decided a verdict on any of the four charges. May we be excused?

Also, one of the jurors is interested in the victim showing us the knot in the radio?

Defense counsel objected "to any procedure in which the victim would at this point in the trial show anything with regard to that." He argued that the State had ample opportunity when the victim was on the stand to have the radio taken apart and to have the witness point to anything inside the radio. The following colloquy then occurred between the judge and defense counsel, out of the presence of the jury:

The COURT: This radio is in evidence. We did have a request early in the trial. We had a note come from the jurors asking if they would be allowed to—I don't remember. I'm paraphrasing—if they would be allowed to look at the place in the radio that the victim told us about. We sent screwdrivers in there. Apparently they don't know what it is they're looking for and I'm inclined to

allow the radio to be opened and to have that area pointed out without any verbal communication at all. Do you object?

DEFENSE ATTORNEY: I object.

THE COURT: All right. Well, that's what we're going to do.

DEFENSE COUNSEL: You're the Judge.

THE COURT: We're going to do it in the morning.

The jury was excused for the evening, and arrangements were made for the victim to return to court the following day.

The next morning, the judge explained to counsel that she was going to ask the victim to

come up, without saying anything to the jurors, open the box and point to the area where you are talking about, and then just go ahead and sit down, because the evidence is all finished and we can't put on any more. This is over [defense counsel's] objection.

In the presence of the jury, the judge asked the victim to open the radio and "show ... the area she was referring to." When the witness experienced some difficulty opening the radio, the jury was allowed to return to the jury deliberation room. After about 15 minutes, defense counsel again objected to the procedure, adding the argument that he was being deprived of any opportunity to cross-examine the witness—a right that he felt was particularly important in view of the difficulty the witness was experiencing in opening the radio, and the absence of any pry marks indicating earlier attempts to open it. The objection was overruled. The witness and the State's Attorney then succeeded in disassembling the radio, and the jury was brought into the courtroom. The following occurred:

THE COURT: Miss _____, would you take the radio, please, and place it on the rail there in front of the last two jurors, and point, if you would, to the area that you were referring to in your testimony.

THE WITNESS: (Pointing.)

THE COURT: All right. Don't worry about the piece that's loose. Just put your finger on the part that you were referring to.

THE WITNESS: (Indicating.)

THE COURT: All right. Now, move it over here for these jurors and do the same thing.

THE WITNESS: (Pointing.)

THE COURT: All right. You will be allowed to take it back in.

The jury resumed its deliberations. After sending a final note asking about the procedure to be followed if the jurors were unable to agree on all counts, the jury returned its verdict that afternoon, finding the defendant guilty of second degree rape and assault and battery, and not guilty of first degree rape and carrying a dangerous and deadly weapon openly with the intent to injure. Consecutive sentences of 20 years were imposed on the two counts, and the defendant appealed. The Court of Special Appeals vacated the sentence for assault and battery, holding that under the circumstances of this case that offense merged with the conviction for second degree rape. The intermediate appellate court affirmed the conviction for second degree rape, however, holding that the evidence received after jury deliberations had begun was "supplementary to evidence already before the jury, ... of a minimal nature and ... not new or unanticipated" and "was simply a further clarification of previously introduced evidence." *Dyson v. State,* 89 Md. App. 651, 658–59, 599 A.2d 832 (1991). We view the additional evidence in a different light, and reverse because of the trial court's refusal to permit cross-examination after the admission of that evidence.

## II.

We agree with the defendant that permitting the victim to point to a knot within the radio in response to the judge's request to "point, if you would, to the area that you

were referring to in your testimony" constitutes additional evidence.

The Federal Rules of Evidence recognize that assertive conduct and verbal statements may be equivalent. Federal Rule of Evidence 801(a)(2) defines "statement" for hearsay purposes as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." The Notes of the Advisory Committee to that rule state: "Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature and to be regarded as a statement." In *McCormick on Evidence* § 250, at 736 (E. Cleary 3d ed. 1984), the authors state:

> Additional inquiry readily shows that nonverbal conduct may unmistakably be just as assertive in nature as though expressed in words. No one would contend, if, in response to a question "Who did it?," one of the auditors held up his hand, that this gesture could be treated as different from an oral or written statement.

In *United States v. Katsouqrakis*, 715 F.2d 769, 774 n. 4 (2d Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), the court noted that a nod in response to a question represents a statement within the meaning of the federal hearsay rule, and thus constitutes hearsay if offered to prove its truth. *See also United States v. Caro*, 569 F.2d 411, 416 n. 9 (5th Cir.1978) ("It is plain that assertive conduct, like an oral declaration, is subject to the hearsay rule."); *United States v. Ross*, 321 F.2d 61, 69 (2d Cir.), *cert. denied*, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963) (holding that an individual's pointing to a written list fell within the hearsay rule, since this act was "as much a communication as a statement that 'This is a list of the names and numbers of the salesmen'" implicated in the securities fraud case would have been).

The witness's action in the case before us was clearly a nonverbal assertion of fact. It was the equivalent of testimony that "this is the knot that my friend and I tied in the band."

### III.

We turn, then, to the question of whether the trial judge erred in allowing the introduction of evidence after the jury had begun its deliberations. Generally, trial judges have broad discretion to reopen a case to receive additional evidence. *Hunt v. State,* 321 Md. 387, 405–06, 583 A.2d 218 (1990), *cert. denied,* — U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Guilmore v. State,* 263 Md. 268, 290, 283 A.2d 371 (1971), *vacated in part,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972). We have not heretofore considered, however, the issue presented by this case—whether a case may be reopened to permit additional evidence after the jury has begun its deliberations.

In *Creasey v. Hogan,* 292 Or. 154, 637 P.2d 114, 124 (1981), the Supreme Court of Oregon said: "We know of no case in which it has been held proper to reopen the case and receive new evidence after the jury has commenced its deliberations, and we do not commend the practice." The majority of courts considering this issue have concluded, however, that the interest of justice requires that the trial judge be given some discretion to permit receipt of additional evidence after jury deliberations have begun, but that this discretion is significantly limited and should be exercised with great caution. *See, e.g., United States v. Bayer,* 331 U.S. 532, 537–39, 67 S.Ct. 1394, 1396–98, 91 L.Ed. 1654 (1947) (not error to refuse otherwise admissible evidence offered after jury had begun deliberations, because of distorted importance likely to be given evidence received at that late stage); *Blissit v. LeFevre,* 924 F.2d 434, 439 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991) (cautioning against routine granting of request to reopen in order to preserve orderly trial process and avoid placing undue emphasis on evidence transmitted to jury during deliberations); *Henry v. United States,* 204 F.2d 817, 820–21 (6th Cir.1953) (admonishing trial judge to exercise extreme caution in reopening at the request of jurors lest undue emphasis be placed on newly admitted evidence); *Eason v. United States,* 281 F.2d 818, 822 (9th

Cir.1960) (reopening case for purpose of introducing over-looked evidence must be done with extreme reluctance because of undue emphasis given to the introduced evidence with consequent distortion of evidence as a whole and possibility of undue prejudice to other party); *State v. McKnight,* 191 Conn. 564, 469 A.2d 397, 405 (1983) (decision to reopen during jury deliberations must be made with "utmost caution"); *Perkins v. State,* 253 Miss. 652, 178 So.2d 694, 696 (1965) (reopening after case submitted to jury permitted only where "a cogent reason [is] found to exist which demands reopening in order that justice be done"); *State v. Wolf,* 44 N.J. 176, 207 A.2d 670, 679 (1965) (action to reopen at that stage should not be taken lightly, but authority exists when the ends of justice will be served by a reopening); *State v. Thomas,* 133 N.H. 360, 577 A.2d 89, 91 (1990) (party seeking to reopen after jury delibera-tions have begun must demonstrate something beyond mere "good cause"); *People v. Olsen,* 34 N.Y.2d 349, 357 N.Y.S.2d 487, 489–90, 313 N.E.2d 782, 784–85 (1974) (court must proceed with great care, closely scrutinizing all fac-tors in order to exercise a well informed discretion); *State v. Duncan,* 102 Utah 449, 132 P.2d 121, 125 (1942) (reopen-ing permitted to receive newly discovered evidence essential for a just verdict where no lack of diligence shown); *State v. Sandler,* 175 W.Va. 572, 336 S.E.2d 535, 539–40 (1985) (practice is not to be encouraged or lightly pursued); *Chan-cellor v. State,* 165 Ga.App. 365, 301 S.E.2d 294, 303 (1983) (upholding refusal to allow reopening once jury delibera-tions had begun); *People v. Newton,* 8 Cal.App.3d 359, 87 Cal.Rptr. 394, 409–10 (1970) (trial judge must consider stage of proceeding, diligence exercised by party offering evi-dence, and potential for undue emphasis); the Court of Appeals of New York discussed some of the problems inherent in reopening a case at this stage of the proceeding, but recognized the inadvisability of a blanket prohibition.

There are obvious reasons why at this stage the power to reopen a case for additional proof must be exercised with utmost caution. One reason of course is that at

some point the trial must come to an end. If requests to reopen were casually granted and became routine, the orderly trial process, fundamental to our jurisprudence, would soon erode away. Another consideration, apart from the merits of a predictable trial pattern, is that new evidence introduced during the jury's deliberations is likely to be given "undue emphasis * * * with consequent distortion of the evidence as a whole giving rise to the real possibility of prejudice to the party against whom the evidence is offered" (*Eason v. United States*, 9 Cir., 281 F.2d 818, 822). On the other hand, a procrustean rule arbitrarily cutting off all possibility of submitting any evidence after the jury has retired, would be difficult to reconcile with the concept of the trial as a truth-finding process. Thus, except for one jurisdiction which has prohibited the practice by statute (see *Beeler v. State*, 374 S.W.2d 237 [Tex.Cr.App.]) the prevailing view permits the trial court some discretionary power to reopen during the jury's deliberations, particularly where an essential element has been overlooked or evidence newly discovered bears directly on the question of the defendant's guilt or innocence (see Ann., Submission of Case to Jury—Reopening, 87 A.L.R.2d 849). And when the request comes from the jury itself, even where the statute otherwise bars reopening the inquiry is permitted, at least to a limited extent.

*People v. Olsen, supra,* 357 N.Y.S.2d at 489–90, 313 N.E.2d at 784–85 (some citations omitted). The Supreme Court of Appeals of West Virginia identified several factors that should be considered by the trial judge in making this decision: Whether good cause is shown; whether the new evidence is significant; whether the jury would be likely to give undue emphasis, prejudicing the party against whom it is offered; whether the evidence is controversial in nature; and, whether the reopening is at the request of the jury or a party. *State v. Thomas,* 179 W.Va. 811, 374 S.E.2d 719, 722 (1988).

■■■ We agree that a trial judge must exercise the utmost caution in reopening a case to allow the introduction

of additional evidence after the jury has begun deliberating. As the Court of Appeals of New York pointed out, the presentation of evidence must come to an end at some time, and the parties must be forewarned that the desirability of maintaining an orderly trial process militates strongly against receiving evidence at that stage of the trial. A premium must necessarily be placed on preparation and diligence, and evidence which is simply the product of an afterthought, no matter how pertinent it may have been if timely offered, will not, except in the most extraordinary circumstances, be received at this late stage of the proceedings. There is, of course, the very strong probability that evidence offered at this point will be given undue emphasis or prominence by the trier of fact. Moreover, if the evidence is at all disputed or controversial, fair opportunity must be afforded for cross-examination and rebuttal. And it may be difficult, if not impossible, to permit effective argument concerning additional evidence without permitting an entire set of new closing arguments.

There will, of course, be those rare circumstances where this extraordinary relief should be granted. Where, for example, a party has painstakingly laid a proper foundation for the introduction of an exhibit and all parties have assumed it is in evidence, but because of an oversight it was not formally offered and received, a trial judge would not err in receiving the exhibit and sending it to the jury. Or, as the Supreme Court of New Jersey speculated in *State v. Wolf, supra*, 207 A.2d at 677:

> Suppose while the jury was deliberating, the prosecutor returned to court with a third person who had just confessed to the shooting, and with some reputable eye witness to the killing who identified such person as the perpetrator, could it be said the court was powerless to reopen the defense and permit the jury to hear the new testimony?

*See also State v. Duncan, supra*, 132 P.2d at 125.

In the case before us, had the State requested that the victim be recalled during the deliberations of the jury,

the request should have been denied. The prosecutor had every opportunity while the victim was on the stand to have the radio disassembled and to have the witness attempt to identify anything of significance within, but he elected not to do so. That a juror requested recall of the witness places the matter in a slightly different posture, but we think the answer should have been the same. The evidence was concluded, and the jurors should have been instructed to decide the case on the evidence before them.

█ We are not to be understood as holding that there was any error in allowing the jurors to open the radio or even in having the radio opened for them. The radio was in evidence, and the jury was entitled to have it and to fully examine it. That procedure would not have entailed the introduction of any additional evidence. The complicating factor in this case, as we pointed out earlier, was the assertive conduct of the witness in pointing to a particular knot within the radio so as to identify that knot as the one she and her friend had earlier tied. There was no extraordinary necessity to allow that additional evidence, which the prosecutor could have produced during the State's case in chief through the exercise of due diligence. The error in allowing the additional evidence might not have warranted a reversal of the conviction, however, if the trial judge had permitted the defendant to cross-examine the victim with respect to this additional evidence.

## IV.

█ The trial judge's refusal to allow defense counsel to cross-examine the victim after she pointed out the knot constituted reversible error. When reopening a case is permitted, it must be done in a way that does not unduly prejudice the rights of any party. *State v. Thomas, supra,* 374 S.E.2d at 722; *Jones v. State,* 15 Ark.App. 283, 692 S.W.2d 775, 777 (1985). Thus, "ample opportunity [must be afforded the opposing party] for cross-examination or rebuttal." *Perkins v. State, supra,* 178 So.2d at 696. *See also*

*Harrison v. United States,* 387 F.2d 614, 616 (5th Cir.1968) (upholding reopening where "[t]he testimony thereupon elicited from the witness was unobjected to and was subject to any cross-examination desired by the defense"). There can be no question about the essential role of cross-examination in the truth-finding process. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

Here, the defendant was denied the opportunity to cross-examine the witness after she pointed out the knot in the band. The trial judge stated:

What I am going to ask [the witness] to do is to come up, without saying anything to the jurors, open the box and point to the area where you are talking about, and then just go ahead and sit down, because the evidence is all finished and we can't put on any more.

Defense counsel objected several times. The defense argued that had the witness done the same thing during the State's case in chief, he would have cross-examined her as to the absence of pry marks visible on the radio. Defense counsel might also have questioned whether all radio bands are not held together by knots, and asked the witness how she could identify *this* particular knot as the one she and her friend had tied. Finally, he might have questioned her regarding her difficulty in disassembling the radio. We cannot tell from this record whether the jury was unable to disassemble the radio, or had done so but was unsure whether the knot it observed in the line was a manufacturer's knot or the one referred to by the witness in her testimony.

It is unnecessary to speculate as to all of the avenues the defense might have pursued if given the opportunity to cross-examine the witness. The identity of the victim's attacker was a critical issue in this case. The fact that the witness' radio could be traced back to the possession of the defendant would obviously be an important factor in linking him to the assault, as evidenced by the jury's focus on the

knot as a means of establishing that the radio was in fact that which was owned by the witness. Given the importance of this piece of evidence, denial of the defendant's right to cross-examine constituted reversible error.

## V.

Finally, we hold that the defendant did not waive his right to cross-examine the witness. Defense counsel objected from the outset, and repeatedly, to the procedure outlined by the trial judge—at one point specifically pointing out that the procedure would deny the defendant the right of cross-examination. As the colloquy we set forth earlier in this opinion demonstrates, the trial judge was not persuaded by defense counsel's objections, and ruled unequivocally that neither counsel could question the witness. Under these circumstances, we find that the defendant complied with the requirement of Maryland Rule 4–323(c) that he "make[ ] known to the court the . . . objection to the action of the court," and he was not required to make a further demand for cross-examination after the witness testified. *See McCloud v. State*, 317 Md. 360, 367–68 n. 6, 564 A.2d 72 (1989); *Gore v. State*, 309 Md. 203, 206–09, 522 A.2d 1338 (1987).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY ST. MARY'S COUNTY.