780 A.2d 466

**Robert James CASON**

v.

**STATE of Maryland.**

**No. 1648, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 7, 2001.

380

382

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief) Baltimore, for appellant.

Jason F. Trumpbour, Staff Atty. (J. Joseph Curran, Jr., Atty., Diane E. Keller, Asst. Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief) Baltimore, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, and JAMES S. GETTY, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

A jury in the Circuit Court for Baltimore City convicted Robert James Cason,[1] the appellant, of possession of heroin with intent to distribute, possession of cocaine with intent to

---

1. The briefs in this Court spelled the appellant's name "Kason." The case was docketed in the circuit court and in this Court under the name "Cason," however. Also, the appellant testified at trial that he spells his last name "Cason."

distribute, simple possession of heroin, and simple possession of cocaine. He was sentenced to a term of 20 years imprisonment for the possession of heroin with intent to distribute conviction and a concurrent 20 year term for the possession of cocaine with intent to distribute conviction. The other convictions were merged for sentencing.

On appeal, the appellant presents the following questions for review:

I. Did the suppression hearing judge err by abandoning his role of neutrality and assuming the role of prosecutor?

II. Did the suppression hearing court err in denying the appellant's motion to suppress evidence observed by the police during a warrantless search of his house?

III. Did the trial court err in denying the appellant's motion for recusal?

IV. Did the trial court err in allowing the case to continue after a violation of the sequestration rule?

V. Did the trial court err in allowing the case to be tried using a xeroxed copy of the search and seizure warrant?

For the following reasons, we answer "no" to these questions. Accordingly, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

In December 1998, the appellant and his wife and daughter were living at 811 Druid Park Lake Drive, in Baltimore City. The home, which was owned by the appellant's mother, was protected by an ADT alarm system. The front bedroom window, on the second story of the house, was not wired into the alarm system, but had a grate affixed to it.

On December 10, 1998, the appellant called his insurance company and reported that he had found the grate on the front bedroom window ajar, that the window itself was damaged, and that some items of personal property were missing

from the room. When the appellant inquired about having the insurance company pay to fix the window, the adjuster responded that he would need a police report number to process the claim. The appellant did not have such a number because he had not reported the alleged break-in to the police.

That night, the appellant called the police to report the break-in. The police did not respond. The following morning, December 11, the appellant again called the police. This time, Officer Steven Mayhan and his partner, Officer Whiting, patrol officers with the central district, responded to the call.[2] They arrived at the appellant's house at approximately 10:00 a.m.

The following is Officer Mayhan's version of the events that culminated in the appellant's arrest.[3]

The appellant met the officers outside, in front of his house. The appellant told the officers that the house had been broken into and pointed to the front bedroom window as the point of entry. He further told the officers that he needed a police report to submit to his insurance company. In response, Officer Mayhan told the appellant that the officers needed to investigate. The appellant then took the officers into the house and led them upstairs to the front bedroom.

Officer Mayhan found the front bedroom window closed with the grate ajar. He examined the window and found no signs of forced entry. The appellant told Officer Mayhan that the items stolen from the room were a .380 handgun and some jewelry. Officer Mayhan looked around the room and saw that it contained numerous palm-sized camcorders and cell phones, a tray of silver coins, and many new VCRs, still in their boxes.

Officer Mayhan and the appellant walked back downstairs. Officer Mayhan asked to be seated at the dining room table so

---

**2.** Officer Whiting's first name does not appear in the record.

**3.** In this regard, Officer Mayhan's testimony is taken from the suppression hearing.

he could speak to the appellant and get some more information from him. Officer Mayhan proceeded to ask the appellant his name, date of birth, and general information necessary for the burglary report. Officer Mayhan sensed that the appellant was irritated about having to give the general information necessary for the burglary report.

While Officer Mayhan was seated at the dining room table asking questions of the appellant, he noticed an ashtray on the table that contained several bullets of different calibers. He also noticed an open toolbox containing "several hundred empty gelatin capsules."

Officer Mayhan told the appellant that he was going out to his police cruiser to get some more reports. In fact, Officer Mayhan went to the cruiser to call the appellant's name and date of birth into the police computer to see if there were any outstanding warrants for him. Officer Mayhan learned that there were two warrants for the appellant, one for a traffic violation and one for a failure to appear. Officer Mayhan then used the cellular telephone in his cruiser to call the district drug unit to determine whether the appellant had a criminal record. He spoke to Detective William Denford and Detective Mark Lunzford, who informed him that the appellant was a convicted felon.

Officer Mayhan returned to the appellant's dining room to continue writing his report. The appellant told him that he thought the burglar had only been inside the front bedroom of the house because the window in that room was the only entry to the house that was not connected to the alarm system.

In response to Officer Mayhan's call to the district drug unit, a number of officers from that unit came to the scene, among them Detective Denford. Officer Mayhan showed Detective Denford the front bedroom window. Officer Mayhan and Detective Denford then went to the basement of the house, where they observed an interior basement room with a door that was knocked off its hinges. The officers looked through the doorway opening to that room and saw a scale, a sandwich bag containing a large amount of white powder, and

what appeared to be drug packaging material. At that point, the officers placed the appellant under arrest.

Detective Denford's rendition of the events in question was as follows.[4] He and his partner, Detective Lunzford, arrived at the appellant's house and were told by Officer Mayhan that he had a suspicious report of a burglary, that the complainant was very nervous, and that there were "several" gelatin capsules in the complainant's dining room. Officer Mayhan and Detective Denford then went to the upstairs bedroom. Detective Denford observed that, although the window grate was open, there were no scrape marks or any signs of forced entry on the window.

Detective Denford, Officer Mayhan, and Detective Lunzford then went to the basement of the house, where they saw an interior door that had been smashed off its hinges and was lying on its side in the doorway. Detective Denford and the other officers went to the basement as part of their investigation of the point of entry of the alleged burglary and to protect the crime scene. Detective Denford denied that the burglary investigation had become a "ruse ... [for] traipsing throughout [the] entire house looking to undercover [sic] controlled dangerous substances [.]" He explained that he looked inside the basement room and saw a plastic bag containing a white substance and vials, capsules, and "stuff" strewn about a table in the room. Based on his training and experience in the field of narcotics investigation, he suspected the white substance to be heroin or cocaine.

Using the information they had obtained in their walk through the basement of the appellant's house, the officers prepared a written application for a search and seizure warrant. The warrant was issued and executed the same day. In the search and seizure effected pursuant to the warrant, the officers found in the basement room of the appellant's house: a brown bag containing 90 red capsules of heroin; a plastic bag containing 49 grams of cocaine; a plastic bag containing

---

4. This testimony likewise is from the suppression hearing.

8.9 grams of heroin; a plastic bag containing 121 grams of a white substance determined to be a non-controlled dangerous substance; a plastic bag containing 10 pounds of a white substance suspected to be a cutting agent; an electronic scale with residue; and implements used in drug processing and distribution. In addition, the officers found and seized 25 bullets from an upstairs bedroom.

Detective Denford testified that an item of evidence marked "item 9," identified as "[t]housands of empty gel capsules," was recovered from the basement and the dining room of the house. When asked by the suppression hearing judge to specify what was seized from the dining room, Detective Denford replied, "bullets, Your Honor, and a bag with several gelatin capsules."

Additional facts will be recounted in our discussion of the issues.

## DISCUSSION

### I.

The appellant first contends that the suppression hearing judge abused his discretion by abandoning his neutral role and assuming the role of prosecutor. Specifically, the appellant argues that the suppression hearing judge acted improperly by reopening the evidentiary portion of the case to admit additional testimony and evidence that the prosecutor had not introduced during his presentation of the case.

Officer Mayhan and Detective Denford were the only witnesses called by the State at the suppression hearing. The appellant and his mother, Carolyn Cason, testified at the suppression hearing. The State called Officer Mayhan as a rebuttal witness and the defense then announced that it had no surrebuttal. The contraband seized in the search of the house was not moved into evidence.

The prosecutor and defense counsel then gave closing arguments to the court. The arguments were interactive, in that the court posed questions and had exchanges with each lawyer

as the lawyer was presenting his argument. During defense counsel's presentation, he argued that the police had acted improperly by going into the basement of the house and, therefore, any contraband seen by them in the basement was not admissible under the plain view doctrine. The following exchange then occurred between the court and the prosecutor:

> THE COURT: Can the Court conclude that [appellant's counsel] . . . is correct as to the basement—if so, can you dissect from that which is in the basement and show me what was found in the tool box?
>
> * * *
>
> Can you tell me exactly what was found in the dining room?
>
> [THE PROSECUTOR]: The officer's testimony says the bag of caps in the box and the several different calibers of ammunition in the ashtray.
>
> THE COURT: All right. Put on that table the bag of narcotics [t]hat was found in the dining room. . . . I want to see the bag of narcotics from the dining room.

The prosecutor pointed out that the contraband had not been admitted into evidence and offered to see if the State's witnesses had the evidence. The court then directed the prosecutor to bring the officers, who were in the hallway, into the courtroom. One of the officers informed the court that the contraband was in the State's Attorney's Office, upstairs in the courthouse. The court directed the officer to retrieve the contraband and bring it into the courtroom. The court then took a brief recess while the officers retrieved the contraband.

When the officers returned to the courtroom, the court asked Detective Denford, who was holding the contraband, to put it on the table and show the court what part of it had been found in the dining room of the house. The record reflects that Officer Mayhan then identified the bag that had been sitting in the toolbox in the dining room by pointing to it.

Ultimately, the court denied the motion to suppress. It concluded that the police had rightfully entered the appellant's house because the appellant had called them and had invited

them into the premises to investigate an alleged break-in. The court further concluded that the search performed by the police "in fact [was] lawfully done in . . . accordance [with] the following of [the] request of the Defendant and their presence in the property itself and that which was found [was] properly seized in accordance with their observations and plain view. . . ."

■ We note, preliminarily, that the appellant failed to preserve his first issue for review. When the trial judge directed the prosecutor and the officers to bring the contraband into the courtroom, the appellant did not object; nor did he object to the presentation of the collection of gelatin capsules at any time before or during the demonstration. An issue not raised or decided in the lower court is not properly preserved for review by this Court. Maryland Rule 8–131(a); *see also State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994) (stating that Md. Rule 8–131(a) furthers the interests of fairness for all parties by " 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.' " (citations omitted) (alteration in original)).

There is no merit to the appellant's argument, moreover, that he did not have time to object, and any objection would have been futile. It is plain from the record that the process by which the contraband was retrieved and brought into the courtroom was prolonged, and permitted ample time for the appellant to lodge an objection. Moreover, we detect nothing about the nature of the suppression hearing judge's direction to the officers to fetch the contraband, or his inquiries of the officers once they had done so, to suggest that he would not have entertained an objection, if one had been made.

■ Even if this issue had been preserved, we would conclude that the suppression hearing judge's act of reopening the evidence and considering the testimony about what part of the contraband was in the toolbox in the dining room was a proper exercise of discretion. In general, the court has

"broad discretion to reopen a case to receive additional evidence." *Dyson v. State*, 328 Md. 490, 500, 615 A.2d 1182 (1992); *see also Spillers v. State*, 10 Md.App. 643, 649, 272 A.2d 49 (1971) (stating that "[o]rdinarily, there is no abuse of discretion in permitting the State to reopen its case for the purpose of proving important or even essential facts to support a conviction. . . ."). The critical issue in determining whether a court abused its discretion in reopening the case is whether its doing so "impaired the ability of the defendant to answer and otherwise receive a fair trial." *State v. Booze*, 334 Md. 64, 76, 637 A.2d 1214 (1994), *subsequent appeal at* 111 Md.App. 208, 681 A.2d 534 (1996), *rev'd on other grounds*, 347 Md. 51, 698 A.2d 1087 (1997).

 Usually, whether the reopening of evidence impaired the defendant's ability to receive a fair trial "is answered by reference to the State's intention in withholding the evidence, *i.e.*, whether it did so in order to gain an unfair advantage from the impact later use of the evidence likely would have on the trier of facts, the nature of the evidence, and its relationship to evidence already in the case." *Id.* (citing *State v. Hepple*, 279 Md. 265, 271, 368 A.2d 445 (1977)). In exercising its discretion, the court

"must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact on the trier of facts. To this end the judge must see whether the proposed evidence is merely cumulative to, or corroborative of, that already offered in chief or whether it is important or essential to a conviction." [*Hepple v. State*, 31 Md.App. 525, 534, 358 A.2d 283 (1976), *aff'd, State v. Hepple*, 279 Md. 265, 368 A.2d 445 (1977) ]. Other factors which have been identified as important to the assessment of the propriety of the trial court's exercise of discretion to vary the order of proof include:

"Whether good cause is shown; whether the new evidence is significant; whether the jury would be likely to give undue emphasis, prejudicing the party against whom it is

offered; whether the evidence is controversial in nature; and, whether the reopening is at the request of the jury or a party." *Dyson v. State,* 328 Md. 490, 615 A.2d 1182 (1992). *Booze,* 334 Md. at 69, 637 A.2d 1214.

Obviously, these factors are only indirectly applicable to the case *sub judice* because the State did not seek to reopen its case; rather, the judge reopened it of his own accord. Thus, there is no evidence of the absence of good cause, *i.e.*, that the State deliberately withheld the evidence in order to present it at a later time and thereby gain an unfair advantage. The nature of the evidence and its relationship to evidence already admitted was that it was corroborative and clarifying of the officers' testimony describing the gelatin capsules on the toolbox. *See Garbutt v. State,* 94 Md.App. 627, 631, 618 A.2d 272 (1993) (holding that the court bailiff's demonstration of various loading procedures of a semiautomatic rifle, following an initial demonstration by a firearms expert, was "simply a clarification of evidence that had been previously presented to the jury" and was solely repetitive.); *but see Boyer v. State,* 102 Md.App. 648, 656–58, 651 A.2d 403 (1995) (holding that introduction into evidence of the actual written document containing the defendant's confession constituted additional, corroborative evidence of the testimony previously presented concerning the confession); *Dyson, supra,* 328 Md. 490, 615 A.2d 1182 (holding that the victim's act of pointing to a knot that she had placed inside a radio that was allegedly hers constituted additional evidence to the victim's previous testimony concerning the knot, and reversing this Court's holding that such evidence was simply a further clarification of previously introduced evidence).

Additionally, there was no danger that a jury would be unduly prejudiced, as the proceeding was before a judge. Furthermore, the appellant in this case was not denied the opportunity to cross-examine or to present rebuttal. *See Dyson,* 328 Md. at 504, 615 A.2d 1182 (stating that "[w]hen reopening a case is permitted, it must be done in a way that does not unduly prejudice the rights of any party .... [t]hus 'ample opportunity [must be afforded the opposing party] for

cross-examination or rebuttal.'") (quoting *Perkins v. State,* 253 Miss. 652, 178 So.2d 694, 696 (1965)) (last alteration in original). Rather, the defense did not attempt to cross-examine the officer after he gave his demonstration.

All but one of the cases that the appellant relies upon in support of his argument that the suppression hearing judge "assumed the role of prosecutor" in reopening the evidence involved situations in which, after the State failed to produce legally sufficient evidence, the judge reopened the State's case in order to allow the prosecution to cure this defect. *See, e.g., State v. Gray,* 8 Neb.App. 973, 606 N.W.2d 478, 495 (2000); *Lyles v. State,* 742 So.2d 842, 843 (Fla.Dist.Ct.App.1999); *McFadden v. State,* 732 So.2d 1180, 1182 (Fla.Dist.Ct.App. 1999), *appeal after remand,* 773 So.2d 1237 (Fla.Dist.Ct.App. 2000); *J.F. v. State,* 718 So.2d 251, 252 (Fla.Dist.Ct.App.1998); *State v. Brock,* 940 S.W.2d 577, 580–81 (Tenn.Crim.App.1996). These cases are inapposite. The remaining case relied upon by the appellant involved a trial judge's "suggesting that the prosecutor should impeach [the defendant's] testimony by proof of a prior conviction," and reopening cross examination for him to do so. *See State v. Finley,* 704 S.W.2d 681, 684 (Mo.Ct.App.1986). In those circumstances, it was clear that the trial judge had abandoned his neutral role and had acted as an advocate by assisting the prosecution in the presentation of its case.

By contrast, the demonstration made at the behest of the suppression hearing judge in this case was not made to present entirely new evidence, or to cure a defect in the State's case. The State already had presented evidence that Officer Mayhan had seen "several hundred empty gelatin capsules" on the dining room table in appellant's home, through the testimony of Officer Mayhan himself. The demonstration simply corroborated that evidence, and assisted the suppression hearing judge in weighing the evidence and making his ruling. The suppression hearing judge did not abuse his discretion in reopening the evidence in order to examine the bag of gelatin capsules, and did not take on the role of advocate in doing so.

## II.

The appellant next contends that the suppression hearing court erred in denying his motion to suppress the contraband seized from his home. Specifically, he argues that the court erred in concluding that, as part of their burglary investigation, the police were entitled to enter the basement of the house and, therefore, the narcotics and drug paraphernalia they observed in plain view were not seized in violation of the Fourth Amendment.

In reviewing the denial of a motion to suppress, we look exclusively to the record of the suppression hearing. *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). "We extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts." *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). In assessing the reasonableness of police conduct, we make our own constitutional appraisal, viewing the evidence in the light most favorable to the State as the prevailing party. *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430 (1992).

As discussed above, several officers from the narcotics unit responded to the appellant's house in order to assist Officer Mayhan with the burglary investigation and possible drug violation. Included among those officers was Detective Denford, who asked Officer Mayhan if he had checked for other possible points of exit and entry for the alleged burglary. Detective Denford testified that it was normal police procedure to do a preliminary investigation and to protect the crime scene at any burglary, including to check for exit and entry points. To that end, Officer Mayhan took Detective Denford to the front bedroom and showed him the window that the appellant thought was the point of entry. Both Officer Mayhan and Detective Denford testified that the window showed no signs of forced entry. For that reason, Officer Mayhan and Detectives Denford and Lunzford inquired where the doors to the house were located and went to the basement

area of the house to determine whether the basement door was a point of entry or exit. According to Detective Denford, once in the basement, they noticed that the rear basement door was ajar. They then proceeded down a narrow corridor toward that door. As they were doing so, they noticed an interior door that was smashed off its hinges, so that the room behind the door was open to view. From outside the room, the officers could see in the room "a plastic bag with a white substance in it and several vials and capsules and stuff strewn about a table in the room." When they saw those items, they placed the appellant under arrest on the outstanding warrants, and Detective Denford and another detective left to obtain a search warrant for the house.

The Fourth Amendment to the United States provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

When a search or seizure is undertaken without a warrant supported by probable cause, it is *per se* unreasonable, subject to some well-established exceptions. *Riddick v. State,* 319 Md. 180, 192, 571 A.2d 1239 (1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). One exception to the warrant requirement is the "plain view" doctrine. *Riddick,* 319 Md. at 192–93, 571 A.2d 1239. That doctrine " 'permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be.' " *Wiggins v. State,* 90 Md.App. 549, 560, 602 A.2d 212 (1992) (quoting *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982)). The Supreme Court "has made clear that 'the plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that

item is lost; the owner may retain the incidents of title and possession but not privacy.' " *Wengert v. State,* 364 Md. 76, 87–88, 771 A.2d 389 (2001) (quoting *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)). In order to have a reasonable seizure under the plain view doctrine, three conditions must be satisfied:

1. There must be a prior valid intrusion into the constitutionally protected area;

2. There must be a spotting in plain view of the item ultimately seized; and

3. There must be probable cause to believe that the item spotted in plain view is evidence of crime.

*Sanford v. State,* 87 Md.App. 23, 27, 589 A.2d 74 (1991).

The appellant points to the case of *Flippo v. West Virginia,* 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999), to support his argument that the fact that he called the police to report a burglary did not authorize a general search of his home. In *Flippo,* James Flippo and his wife were vacationing at a cabin in a state park when Mr. Flippo called 911 to report that they had been attacked. The police arrived and discovered that Mr. Flippo's wife had suffered fatal head wounds. After taking Mr. Flippo to the hospital, the police returned and searched the cabin under the guise of "process[ing] the crime scene." *Flippo,* 528 U.S. at 12, 120 S.Ct. 7. The trial court found that "after the homicide crime scene was secured for investigation, a search of 'anything and everything found within the crime scene area' was 'within the law.' " *Id.* at 14, 120 S.Ct. 7. The Supreme Court reversed, holding that there is no "murder scene exception" to the Fourth Amendment. *Id.* The *Flippo* case is inapposite to the instant case, however, because the Supreme Court specifically stated that it took no position on "the theory that petitioner's direction of the police to the scene of the attack implied consent to search.... [nor] on the applicability of any other exception to the warrant rule...." *Id.* at 14–15, 120 S.Ct. 7.

The case of *Wengert v. State, supra,* 364 Md. 76, 771 A.2d 389, is more instructive. In that case, the police arrived at

Wengert's home while a burglary was in progress. After placing the burglar in custody, the police did a sweep of the house to look for additional suspects, victims, and residents. In the course of that sweep, the police observed evidence of a gambling operation, in plain view. Wengert argued that even if the initial entry into his home was lawful, the detailed search of his home by the police after the burglar was captured was an unreasonable intrusion. The Court of Appeals rejected that argument and upheld the search under the plain view exception to the warrant requirement. *Id.* at 90–91, 771 A.2d 389. It explained that "the police had a lawful right of access to the items that they seized, i.e., they discovered the objects while acting within the bounds of the search justified by the exigent circumstances." *Id.* at 91, 771 A.2d 389.

In the instant case, there were no exigent circumstances. The police were justified in being in the appellant's home, however, because they had been invited in to prepare a burglary report, and they had told the appellant that they would need to investigate in order to prepare the report. Officer Mayhan and Detective Denford each testified that the upstairs front bedroom window, which the appellant claimed was the point of entry for the burglary, bore no signs of forced entry. Detective Denford explained that it was standard procedure in any burglary to look for entry and exit points. Thus, it was consistent with police procedure for the officers to continue to investigate for entry and exit points. It was while the officers were in the basement of the house looking for entry and exit points that they saw a plastic bag containing a white substance and drug paraphernalia, in plain view.

Given Detective Denford's training and experience in narcotics investigation, the officers had probable cause to suspect the white substance was a controlled dangerous substance. *See Wengert*, 364 Md. at 90, 771 A.2d 389 (stating that probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69

L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime....").

■ The elements required for the plain view doctrine to apply were satisfied in this case. The police were lawfully present in the appellant's home, at the appellant's invitation, to investigate a burglary; in the course of that investigation, they observed the contraband in plain view; and they had probable cause to believe the contraband was evidence of a crime. Even if the officers had had a subjective intent to search for evidence of criminal activity while completing the burglary investigation, it is well-established that an officer's subjective motive does not invalidate "objectively justifiable behavior under the Fourth Amendment." *Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

The officers saw the contraband in plain view when they were lawfully in the basement of the appellant's home following police procedure for a burglary investigation. Accordingly, we uphold the suppression hearing court's denial of the appellant's motion to suppress the evidence seized from his home.

## III.

■ The appellant's next contention is that the trial court erred in denying his motion for recusal. Specifically, the appellant argues that after he sent the trial judge a letter stating that he had witnessed a trial over which he had presided, and was "appalled" by his handling of it, and requesting that the judge recuse himself from this case, the trial judge improperly refused to do so.

■ In Maryland, it is beyond cavil that an impartial and disinterested judge is fundamental to a defendant's right to a fair trial. *See Jefferson–El v. State,* 330 Md. 99, 105, 622 A.2d 737 (1993); *see generally Reed v. Baltimore Life Ins. Co.,* 127 Md.App. 536, 550, 733 A.2d 1106 (1999) (stating that when reviewing a complaint that the trial judge erred by denying a

motion for recusal, " 'our inquiry is limited to what impact, if any, the trial judge's alleged conduct had on the appellant's ability to obtain a fair trial. . . . We are not . . . concerned with adjudication of judicial misconduct.' ") (quoting *Braxton v. Faber*, 91 Md.App. 391, 405 n. 6, 604 A.2d 543 (1992)). A party has the right to a trial by a judge who is not only impartial and disinterested, but also has the appearance of being impartial and disinterested. *Scott v. State*, 110 Md.App. 464, 486, 677 A.2d 1078 (1996).

■■■ As we explained in *Scott*, however,

[a] party who wishes to show that a judge is not impartial or disinterested has a high burden to meet. In Maryland, "there is a strong presumption . . . that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." [*Jefferson–El*, 330 Md.] at 107, 622 A.2d 737. "To overcome the presumption of impartiality, the party requesting recusal must prove that the trial judge has 'a personal bias or prejudice' concerning him or 'personal knowledge of disputed evidentiary facts concerning the proceedings.' " *Id.* Further, "[o]nly bias, prejudice, or knowledge derived from an extrajudicial source is 'personal.' " *Id.*

A party wishing to show that a judge does not have the appearance of impartiality, however, has a slightly lesser burden. Appearance of disinterestedness or impartiality is determined by "examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Id.* at 108, 622 A.2d 737, 330 Md. 99, 622 A.2d 737 (citing *Boyd v. State*, 321 Md. 69, 86, 581 A.2d 1 (1990)).

*Scott*, 110 Md.App. at 486–87, 677 A.2d 1078. Mere "[b]ald allegations and adverse rulings are not sufficient to overcome the presumption of impartiality." *Reed*, 127 Md.App. at 556, 733 A.2d 1106.

We discern no facts in the record that would indicate either impartiality or the appearance of impartiality on the part of

the trial judge with respect to the appellant, personally, or with respect to the proceedings concerning the appellant. Rather, the appellant's contention seems to fit more appropriately in the category of a "bald allegation." The trial court did not abuse its discretion in denying the appellant's motion for recusal.

## IV.

Next, the appellant contends that the suppression hearing court "erred in allowing the case to continue after a violation of the sequestration rule." He presents this argument in a single paragraph with no legal argument or supporting authority. To the extent we can follow it, his argument seems to be that when the suppression hearing court called all of the witnesses into the courtroom and directed one of them, in the presence of the others, to identify the gelatin capsules observed in the toolbox in the appellant's dining room, there was a break in the sequestration order imposed at the outset of the hearing; and the break in sequestration prejudiced him because during trial the prosecutor elicited testimony from another police officer that the gelatin capsules had been seen in the dining room. Apparently, the appellant contends that the trial court should have declared a mistrial.

Our function as an appellate court is to review the decisions, rulings, and actions of the circuit court. There is no decision, ruling, or action to review with respect to this issue, however, because the appellant never raised an objection or sought a ruling. In short, he waived this issue for review. Having not made his concern about prejudice known to the suppression hearing court or the trial court, and having not moved for a mistrial, the appellant cannot argue on appeal that the trial court should have *sua sponte* declared a mistrial.

## V.

The appellant's final contention is that the trial court erred in not "mak[ing] a finding as to whether or not the [search] warrant [in this case] actually existed." Before trial, defense

counsel requested production of the original, signed search warrant. The prosecutor was unable to produce the original warrant, however, and the judge who had signed it did not have a copy of it in his file. Defense counsel refused to stipulate that a xeroxed copy of the warrant that he had been provided was, in fact, a copy of the original, signed warrant.

The appellant argues that even though the suppression hearing judge ruled that the contraband had been lawfully seized under an exception to the warrant requirement (that is, the plain view doctrine), so that whether the warrant actually had issued was of no consequence, the issue of the existence of the warrant somehow negatively affected the credibility of the police officers when they testified at trial, before the same judge.

The appellant failed to preserve this issue for review because he never asked the trial court to make a finding that the warrant did not exist. Md. Rule 8–131(a). To the extent we can discern the argument (which, like the previous contention, is presented without legal analysis or authority), it appears to have no merit whatsoever. The appellant is arguing, in effect, that the trial court would have found the officers less credible if it had determined that the search warrant never had existed; therefore, not deciding the question whether the search warrant existed made the others' testimony more credible than it otherwise would have been. This argument is nothing short of rank speculation. How a finding on the existence of the warrant would have affected the trial court's assessment of the officers' credibility, if at all, is impossible to know. We can say, however, that we extend great deference to the findings of the lower court with respect to determinations of witness credibility, *Sutton v. State*, 128 Md.App. 308, 313, 738 A.2d 286 (1999), and that we have no reason to think that the court abused its discretion in making credibility assessments in this case.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**