905 A.2d 385

**Gerald WISNESKI**

v.

**STATE of Maryland.**

**No. 222, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

July 12, 2006.

Renee M. Hutchins (Michael Millemann, on the brief), Baltimore, for Appellant.

Sarah Page Pritzlaff (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, JAMES R. EYLER, and BARBERA, JJ.

HOLLANDER, Judge.

In this appeal, we must determine, *inter alia,* whether the common law crime of indecent exposure encompasses intentional conduct that occurs within a private home of a third

party. A jury in the Circuit Court for Montgomery County convicted Gerald Wisneski, appellant, of indecent exposure; illegal possession of a regulated firearm by a person previously convicted of a crime of violence; illegal possession of a regulated firearm by a person previously convicted of a disqualifying crime; and wearing, carrying, or transporting a handgun. Thereafter, the court imposed a mandatory sentence of five years for the first firearm count, merged the other handgun convictions, and imposed a consecutive six-month sentence for the crime of indecent exposure.

On appeal, Wisneski asks:

1. As a matter of law, can a private residence being used by the owner to entertain three personal friends constitute a "public place" under the common law crime of indecent exposure?

2. Did the trial court abuse its discretion by permitting the State to reopen its case and introduce additional evidence where the prosecutor did not show due diligence?

For the reasons set forth below, we shall affirm.

### FACTUAL SUMMARY

The indictment charged appellant, in part:

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **GERALD EUGENE WISNESKI,** on or about July 1, 2004, in Montgomery County, Maryland, did indecently expose his person a *public place* [sic], in violation of the Common Law against the peace, government, and dignity of the State.

(Emphasis added).

The trial began on March 1, 2005. The following evidence was adduced.

On July 1, 2004, appellant visited his friend, Bridgette Penfield, at her trailer home, located in a "trailer park" in Germantown in Montgomery County. At around 7 P.M. on that date, Ms. Penfield's neighbors, fifteen-year-old Jennifer

James and her older brother, Brandon James, also arrived to visit Ms. Penfield.[1]

Ms. James testified that, when she and her brother entered the trailer, Mr. Wisneski was "sitting on the ... big couch facing like the big window pane," and he "was drinking beer." According to Ms. James, Wisneski "just started talking sexual stuff" to her, and he asked her if she was "on [her] period...." " Shortly thereafter, appellant stood up and "pulled out his penis" and his testicles from his shorts. Then, while appellant was holding his penis and his testicles in his hand, he shook them at Ms. James. She recalled: "I turned my head real fast." According to Ms. James, her brother "just started going off" and "tried to fight" appellant, but Ms. Penfield "got in the middle of it and then tried to stop it...." "

Ms. James recalled that appellant then put his genitals back in his shorts. However, he placed his hands over "his private part and started shaking it." Ms. James claimed that Wisneski then left the trailer and went home to retrieve a gun; he returned a few minutes later. According to Ms. James, she saw "the outline" of a gun on appellant. Ms. James went home, told her mother appellant had a gun, and her mother "called the cops."

Mr. James essentially offered a similar account of the events. He testified that he went to Ms. Penfield's trailer earlier that day, at about noon, without his sister. At the time, appellant was "[s]itting in the chair beside the window," [2] and he and Ms. Penfield were drinking beer. Mr. James left at around 2:00 P.M., but returned later that day with his sister. At that time, Wisneski asked Ms. James if she was "on

---

1. Appellant was born in 1963. Ms. James was sixteen years old at the time of trial. Mr. James testified that Ms. Penfield was "Forty-some" years old. According to Ms. James, Ms. Penfield was in the hospital at the time of trial.

2. As we discuss, *infra,* we found no other testimony that referred to a window in the trailer. Therefore, we do not know the dimensions of the window, whether it was covered by curtains or blinds, or appellant's proximity to it when he exposed himself.

her period," and Mr. James watched as Wisneski "dropped" his "pants completely" and shook his "uncovered" penis at his sister. Mr. James began "flipping out" and "screaming" at Wisneski. Ms. Penfield came between them to prevent a fight.

Two police officers also testified. They explained that they responded to the area based on a call to the police concerning a man with a gun. Upon locating Wisneski, they took him into custody and, in a search of his shopping bag, incident to his arrest, the police discovered a handgun with "two live rounds . . . .," i.e., two .22–caliber bullets inside the weapon.

During the State's case-in-chief, the prosecutor failed to introduce a stipulation that had been reached before the trial began. In particular, the parties had agreed to stipulate that Wisneski had previously been convicted of a crime of violence and a disqualifying crime. The following pre-trial exchange is pertinent:

[PROSECUTOR]: Your Honor, with regard to this charging document, Mr. Wisneski is charged under the Public Safety Article for two different counts under Section 133. The indictment if you read the language reflects that one of those counts is the B count, which is possession of a regulated firearm, having been convicted of a crime of violence. The second, which is count two, is cited as 133B again, which is possessing a firearm having been convicted of a disqualifying crime. I spoke with [defense counsel] and it is my understanding that there will be a stipulation that in fact Mr. Wisneski has been convicted of both a disqualifying crime and a crime of violence.

* * *

[DEFENSE COUNSEL]: We're out of the presence of a jury. I'll stipulate that he's been convicted of second degree assault and wearing and carrying a handgun I believe.

* * *

[THE COURT]: All right, so the stipulation is that the crime of violence in question is a second degree assault.

* * *

[THE COURT]: Okay. All right, so let's just review. Count 1 is 5–133(c) which is possession of a handgun by a person convicted of a crime of violence. Count 2 is 5–133(b) possession of regulated firearm by someone who's been convicted of a disqualifying crime. The disqualifying crime being the prior handgun charge. Are we all in agreement?

[DEFENSE COUNSEL]: That's correct, Your Honor.

After the State rested, the defense moved for judgment of acquittal, which the court denied. The defense then rested without calling any witnesses, and renewed its motion for judgment of acquittal.

As to the charge of indecent exposure, the defense argued:

I don't recollect there being any testimony about him exposing himself in a public place. Now I know that there are and I don't recollect there being any testimony about people on the outside of the trailer being able to see in wherever he was situated when he allegedly did that in the trailer. And therefore I would suggest to the court, first of all, this is a private residence. There's no testimony about what people passing by or outside of the trailer might have seen if they had been looking. There's no testimony that there were windows or doors with glass in them or that you could see out of the [trailer]. I would submit to the court that it was not a public place, nor was it a place which could be viewed by the public had they been looking and therefore with regard to that charge I would ask the court to dismiss it at this time.

The court denied the motion as to the charge of indecent exposure. It reasoned that the "public place" element of the crime of indecent exposure is satisfied "if it occurs under circumstances where it could be seen by other people if they happen to look...."

Because the State failed to introduce the stipulation that appellant had prior convictions that disqualified him from possessing a firearm, appellant also moved for judgment of acquittal in regard to the two charges involving illegal posses-

sion of a regulated firearm. The following exchange is relevant:

> [DEFENSE COUNSEL]: [A]t this point in time, Your Honor, I don't believe stipulations are in evidence. Therefore, I believe that the evidence with regard to count one and count two are lacking because they're not in evidence.
>
> We certainly discussed them and I certainly indicate[d] that I would stipulate but I don't believe that they've been placed in evidence by any stipulation before the jury for the jury to have. We certainly did discuss them with the court but I believe those things must be moved into evidence in front of the jury and the jury must be told at some point in time before the case concludes. Therefore, I would suggest to the court that these matters are not in evidence. The case has concluded. I suggest to the court with regard to counts one and two, there's no evidence that the jury has and with the case being concluded, that my client has been convicted of a crime of violence or has been convicted of a disqualifying crime.
>
> [PROSECUTOR]: Your Honor, this whole matter proceeded, as you are well aware, from yesterday morning on the idea that there was a stipulation in place or in effect. I don't, at this point I think it's, I don't think it's fair—
>
> [THE COURT]: What you're saying is if it's necessary to move to reopen your case to place the stipulations on the record in front of the jury, you're asking to do that.
>
> [PROSECUTOR]: I would, if the court is inclined to do that I would be asking the court to do that if the court believes it's necessary. I was under the impression that that stipulation was already on the record.
>
> [THE COURT]: It is on the record. It's not on the record in front of the jury yet.
>
> [PROSECUTOR]: All right, Your Honor.
>
> [THE COURT]: Do you object to reopening the case?
>
> [DEFENSE COUNSEL]: Yes, Your Honor, I do.
>
> [THE COURT]: Okay, well I'm going to allow him to do it.

\* \* \*

[DEFENSE COUNSEL]: [T]he court has indicated that it will allow the State, over my objection and I do note my objection, the State to reopen this case to put before the jury the stipulation. There is a sheet entitled stipulation of facts here which I understand the court is then going to read as part of this instruction to the jury.

[THE COURT]: What I was actually going to do was just read it to them when they come back as part of the evidence in the case and not repeat it again as part of the instructions.

[DEFENSE COUNSEL]: Okay, that was my concern that this part was being emphasized unduly by reading it twice.

[THE COURT]: I agree.

Accordingly, before instructing the jury as to the law, the court read the following stipulation to the jury:

The State and the Defense have agreed that the defendant was convicted of a disqualifying crime on September 10, 1996 and a crime of violence on February 5, 2002. These facts are not in dispute and should be considered proven. That's of some significance when we get to instructions on the law as to the specific offenses in this case.

Thereafter, in relevant part, the court instructed the jury:

One of the other crimes charged is illegal possession of a regulated firearm. In order to convict the defendant, the State must prove first, that the defendant possessed a regulated firearm and secondly that the defendant had previously been convicted of a disqualifying crime. Remember, I told you that term disqualifying crime was something we talked about earlier on stipulations.

* * *

The State and the Defense have agreed that the defendant was convicted of a disqualifying crime on September 10, 1996 and that fact is not in dispute.

Separate charge. Illegal possession of a regulated firearm and in order to convict the defendant the State must prove that he possessed a regulated firearm and that he had

previously been convicted of a crime of violence. A handgun, whether loaded or unloaded, is a regulated firearm....

\* \* \*

In order to convict the defendant of indecent exposure you must find beyond a reasonable doubt that the defendant intentionally exposed his penis or other body part that should not be exhibited in a public place. Indecent exposure, to amount to a crime, must have been done intentionally. Intent may be inferred from the conduct of the accused and the circumstances and the environment of the occurrence.

An exposure becomes indecent ... when [a] defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others. An exposure is public or in a public place if it occurs under such circumstances that it could be seen by a number of persons if they were present and happen to look. It is immaterial that the exposure is seen by only one person if it occurs at a place open or exposed to the view of the public and where anyone who happened to have been nearby could have seen had he looked.

In order to convict the defendant of indecent exposure the State must prove that the defendant exposed his penis, that he acted wilfully in doing so, that he was in a public place and that he was in the presence of another person or other persons who saw it.

No exceptions were taken to the jury instructions.[3]

In closing argument, the prosecutor acknowledged that the State had to prove that appellant exposed himself in a "public place." The prosecutor argued, in part:

---

3. In its brief, the State notes that appellant did not object to the jury instructions concerning indecent exposure. The State suggests, however, that any waiver or non-preservation by appellant would apply only to a claim of error concerning the jury instructions; the State does not suggest that appellant has failed to preserve his claim that the trailer did not constitute a "public place."

This occurred in a trailer home. There were at least three other people there present. Two of those people testified that they saw it. Ladies and gentlemen, this is a public place. There were people there. He knew they were there. It was done in a public place. . . .

The defense countered:

This was the home of Ms. Penfield, a witness that we did not have the opportunity to see. This is her home by all the testimony. It is a trailer but that does not diminish the fact that it's her home. It's not a public place. There is no evidence at all that someone walking by could see anything. There's no evidence—I don't know whether there was windows with curtains or not. I don't know that there were windows for that matter [from] this testimony, but we can assume there's windows. We can assume the person had curtains in the windows. I don't know if they were curtains that open and close. I don't know whether anybody did see in or out of the trailer. That testimony is not before you.

In rebuttal, the State did not address the defense's contention that the State failed to prove the "public place" element of the indecent exposure charge. Rather, it responded only to the defense's argument concerning the gun charges.

## DISCUSSION

### I.

Appellant contends that in Maryland the offense of indecent exposure can only occur in a "public place." Because the exposure took place in the "confines of Bridgette Penfield's private home," asserts appellant, the element of a "public place" was not met. Therefore, he maintains that the "court erred, as a matter of law, in finding that a private residence being used by the owner to entertain three personal friends constituted a 'public place' under the common law crime of indecent exposure." He adds: "Maryland case law, common usage, and the Fourth Amendment distinction between public

and private places confirm that the private residence at issue in this case, was not, as a matter of law, a public place."

Although appellant acknowledges that "[t]he term public place 'depends on the circumstances of the case,'" he avers that "generally [it has] been held to include only those places where exposure 'is likely to be seen by a number of *casual* observers.' *Messina v. State*, 212 Md. 602, 605, 130 A.2d 578 (1957) (emphasis added). . . ." While Wisneski recognizes that the State can criminalize conduct that occurs in a private home, he asserts: "[I]n such cases, there is no public place element because it is the prohibited conduct, in and of itself, that the State seeks to punish. In contrast, the common law offense of indecent exposure does not seek to criminalize exposure alone. Rather, it is the *public* nature of the exposure that makes it indecent, hence the requirement that it occur in public view." (Emphasis in original). In his view, the court's determination that Ms. Penfield's private home is "within the scope of the term 'public place'" is "inconsistent with the common usage of that term, the case law of this State, and the Supreme Court's long-standing distinction between public and private realms."

According to appellant, the State "mischaracterizes the definition of public place by implying that *any* exposure observed by one or more people is criminally indecent." (Underline in original). He observes that "no Maryland appellate decisions have ever upheld a conviction for indecent exposure where, as in this case, the conduct occurred within the four walls of a private residence and was not observed by outsiders or casual observes." Therefore, he urges this Court to reject the State's claim that "the private residence at issue in this case satisfied the public place element of the crime of indecent exposure. . . ."

According to the State, the evidence was sufficient to support Wisneski's conviction for indecent exposure. In its view, "the common law definition of 'public place' is not confined for purposes of indecent exposure to areas where the public has a legal right to be." Instead, says the State, "a public place is

where an actor might reasonably expect his conduct to be viewed by another."

The State points out that, while appellant was a visitor in someone else's home, he was "positioned across from 'the big window pane' in the living room . . . ." and, in the presence of three other people, he "intentionally exposed his genitals" to them. Based on these facts, the State argues:

> Under these circumstances, Wisneski was not engaging in private behavior on private property, but was purposefully and indecently exposing himself to the minor as well as others in the living room, and, presumably, anyone who happened to look through the window from the street. Wisneski's conduct is not protected by the fact that it occurred at a private home. Regardless whether Wisneski's conduct occurred on public or private property, his acts offended public decency, and was, in either venue, offensive to those who might see him.

With regard to appellant's Fourth Amendment argument, the State maintains that "Wisneski's discussion of the protections that the Fourth Amendment extends to private residences misses the mark." Indeed, it asserts: "Wisneski's assertion that the common law crime of indecent exposure categorically excludes exposures occurring in private homes is wrong . . . ."

In his reply brief, appellant maintains that the State "misses the point." He explains:

> The suggestion is not that Gerald Wisneski's conduct was protected by the Fourth Amendment. Rather, the Fourth Amendment's long-standing recognition of a difference between public and private space is further evidence that the similar distinction made under Maryland law is a rational one that should not lightly be rejected. Where [the State] asks this Court to expand the common law definition of "public," to include a private home being used to entertain three friends, he clearly ignores this important decision.

In 1902, the Legislature codified the common law crime of indecent exposure in § 122 of Article 27 of the Md.Code,

which classified the offense as a "Disturbance of the Public Peace," under the subtitle of the same name. *Dill v. State,* 24 Md.App. 695, 700–01, 332 A.2d 690 (1975); *see Neal v. State,* 45 Md.App. 549, 550, 413 A.2d 1386, *cert. denied,* 288 Md. 740 (1980). The statute criminalized conduct in which an individual "indecently expos[ed] his person on or about any steamboat wharf, dock or public waiting room, or in or about the station grounds of any railroad in the State, or in or on any steamboat, streetcar, electric car, railroad car, passenger train or other public conveyance." *Id.* at 701, 332 A.2d 690.

Sixty-five years later, in 1967, the General Assembly amended the statute to add a "catch-all" to the public locations enumerated in the 1902 language.[4] Specifically, the Legislature proscribed indecent exposure "on or about any public place." *Id.* According to the *Dill* Court, the addition of that phrase "brought the statutory crime squarely in line with the common law offense," because each "had the identical essential elements. . . ." *Id.* at 705, 332 A.2d 690. The Court added: "[T]here is no distinction between the substantive offense of indecent exposure under the common law and the statute." *Id.* Consequently, said the *Dill* Court, the 1967 enactment "supplanted" the common law. *Id.*

Then, three years after *Dill,* the Legislature amended the language in the statute to exclude the text precisely describing the crime of indecent exposure. Instead, it retained only the sentencing provisions for the offense, found in Art. 27, § 335A. *Neal,* 45 Md.App. at 550–51, 413 A.2d 1386. The effect of that amendment was to revive the common law offense. *Id.* at 551, 413 A.2d 1386.

The Maryland appellate courts have reviewed public exposure convictions in only a handful of reported opinions. According to appellant, on each occasion the appellate courts

---

4. As the *Dill* Court explained, prior to June 1, 1967, when the 1967 enactment took effect, "the criminal law of this State included [both] the common law offense of indecent exposure and the statutory offense of indecent exposure constituting disorderly conduct." *Dill,* 24 Md. App. at 704, 332 A.2d 690.

have been "faithful to the common law understanding of the crime and its public place elements."

Writing for this Court in *Dill*, 24 Md.App. at 699–700, 332 A.2d 690, Judge Orth articulated the elements of the offense:

The authorities ... are in substantial accord that at the common law indecent exposure was the wilful and intentional exposure of the private parts of one's body *in a public place in the presence of an assembly.* Thus, its main elements were the wilful exposure, the public place in which it was performed, and the presence of persons who saw it.

(Emphasis added).

We focus here on the element of a "public place." In *Messina v. State*, 212 Md. 602, 130 A.2d 578 (1957), the Court of Appeals discussed the element of a "public place" for purposes of the common law offense of indecent exposure. Messina was convicted of indecent exposure based on evidence that he exposed himself to two teenaged girls while sitting in a car parked along a Baltimore City street. *Id.* at 604, 130 A.2d 578. Although both girls were walking on the sidewalk, only one of them actually saw the exposure. *Id.* On appeal, Messina argued "that since only one person saw the indecency there was not such a public exposure, such an affront to public decency, as the common law requires to make the conduct a crime." *Id.* at 605, 130 A.2d 578. The Court of Appeals disagreed, stating: "The law is not as the appellant suggests." *Id.*

In upholding the conviction, the Court emphasized that what constitutes a "public place" depends on the circumstances of the particular case. Quoting 67 C.J.S. Obscenity § 5 (1955), the Court stated:

"Indecent exposure in a public place in such a manner that the act is seen or is likely to be seen by casual observers is an offense at common law.... Ordinarily, ... the place where the exposure is made must be public. *What constitutes a public place within the meaning of this offense depends on the circumstances of the case.* The place where the offense is committed is a public one if the exposure be

such that it is likely to be seen by a number of casual observers...."

*Messina,* 212 Md. at 605, 130 A.2d 578 (emphasis added; omissions in original). The Court continued: "'An exposure is "public," or in a "public place," if it occurs under such circumstances that it could be seen by a number of persons, if they were present and happened to look.'" *Id.* at 606, 130 A.2d 578 (quoting Hochheimer on *Crime and Criminal Procedure,* at 430 (2d. ed. 1904)).[5] The *Dill* Court subsequently reiterated what was expressed in *Messina. See Dill,* 24 Md.App. at 699–700, 332 A.2d 690.

Unlike Maryland, many jurisdictions have enacted statutes that cover the issue presented here. *See generally,* David C. Minneman, *Annotation, "What Constitutes 'Public Place' Within Meaning of State Statute or Local Ordinance Prohibiting Indecency or Commission of Sexual Act in Public Place,"* 95 A.L.R. 5th 229 (2006). Although many of the decisions from other jurisdictions are based on statutes that are not necessarily coterminous with this State's common law definition of the crime of indecent exposure, these decisions help to elucidate the element of "public place." We pause to review some of these cases.

In *Greene v. State,* 191 Ga.App. 149, 381 S.E.2d 310 (1989), *cert. denied* (May 4, 1989), the defendant was convicted of public indecency after he appeared nude in the presence of a teenage female babysitter in the bedroom and bathroom of his own home. *Id.* at 310. On appeal, he argued that his

---

**5.** In addition to *Messina, Dill,* and *Neal,* appellant includes *Neville v. State,* 290 Md. 364, 430 A.2d 570 (1981), as the fourth indecent exposure case reported in Maryland. In *Neville,* the trial court acquitted the defendant of indecent exposure arising out of a perverted sexual act. *Id.* at 379, 430 A.2d 570. The Court of Appeals noted that the trial court "reasoned that an essential element of the crime of indecent exposure was that the exposure must be seen or be likely to be seen by a casual observer and then held that [the arresting] Officer ... who was 'required to literally stalk the Defendant ... was not a "casual observer" as defined in *Messina.'* I ]" *Id.* However, in a footnote, the Court of Appeals also stated: "The indecent exposure charge is *not before us and we express no opinion on this application of Messina." Id.* at 379 n. 11, 430 A.2d 570. (Emphasis added).

bedroom and bathroom were not "public places" within the meaning of that state's statute and that his marital bedroom was a "sacred precinct" protected by the United States Constitution. *Id.* at 311. The court rejected his arguments. The *Greene* Court noted that "public place" was broadly defined by statute as " 'any place where the conduct involved may reasonably be expected to be viewed by people other than members of the actor's family or household.' " *Id.* Yet, the court recognized that what constitutes a "public" place is a question of fact. It concluded that one's home "is not necessarily circumscribed from inclusion as a 'public place.' " *Id.* (Citation omitted). To the contrary, said the court, it was "not necessary that the place be visible to members of the public who are outside of it...." *Id.* at 311. In its view, the defendant, "by his own behavior removed the barrier [of privacy] and converted his bedroom and bath from a private zone to a public place, where his nudity might reasonably be expected to be viewed by people other than members of his family or household." *Id.*

The Georgia appellate court reached a similar outcome in *McGee v. State*, 165 Ga.App. 423, 299 S.E.2d 573 (1983). There, the defendant and the victim were inside the victim's apartment when the defendant told the victim he wanted to masturbate in front of her. *Id.* at 574. When the victim told the defendant to leave the apartment the defendant refused and became agitated. *Id.* at 575. Fearful for her safety, the victim told the defendant to "do what he needed to do and get out." *Id.* On appeal, the defendant argued that because his acts were done in the privacy of the victim's apartment, he could not be guilty of public indecency. *Id.* Noting the statutory definition of "public place," set forth above, the court disagreed. It stated, *id.*:

> [T]he victim's apartment would have been a "public place" as to the defendant if it were such a place where the lewd exposure might reasonably have been expected to have been viewed by [another] person or persons.... We hold, therefore, that the victim's apartment was a "public place" as to this defendant under Code Ann. § 26–401(m).

*People v. Legel,* 24 Ill.App.3d 554, 321 N.E.2d 164 (1974), is also noteworthy. There, a defendant was arrested for indecent exposure that occurred when he exposed his genitals while standing on the dining room table in front of a window of his home. *Id.* at 166. On appeal, the defendant challenged his conviction, claiming the interior of his home was not a "public place," within the meaning of the statute prohibiting "public indecency." He maintained that "his home is his castle" and thus "activities within the confines of his walls are private." *Id.* at 168. The Court soundly rejected that view.

The Illinois statute in issue defined "public place" as " 'any place where the conduct may reasonably be expected to be viewed by others.' " *Id.* at 167. Notably, the *Legel* Court said, *id.* at 168: "It is the probability of public view that is crucial rather than the ownership or use of the particular real estate upon which the act occurs." Further, the court reasoned, *id.*:

> [A] room in one's own home may be a "public place" under certain circumstances.... The vantage point of the observer is relevant only insofar as it sheds light on the controlling inquiry of whether there was a reasonable expectation that the actor's conduct would be viewed by others. The purpose of this section is to protect the public from shocking and embarrassing displays of sexual activities. *A person need not be in a public place to be a member of the public. The ambit of protection afforded by this statute clearly extends to members of the public in their own homes.*

(Emphasis added).

Moreover, the court said, *id.* (emphasis added):

> The duty lies with the deviate to keep his activities private. Where the evidence shows that it was reasonably foreseeable that the lewd conduct would be viewed by the casual public observer, there is a reasonable expectation of public view and the acts can be held to have occurred in a 'public place' by reason of the statutory definition.

Characterizing appellant's "home is castle" position as a "non-sequitur," the court explained, *id.* (emphasis added):

It is true that a person's home is protected by law from intrusion by trespassers, but *activities within the confines of one's home are protected only to the extent that the individual seeks to preserve his activities as private.* "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (*Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).) Such is the present case. The facts, as related, clearly show that defendant made no attempt to preserve his activities as private. A reasonable man in the position of the defendant would expect his conduct to be viewed by others (and here, 'others' included the minor girls of the neighboring family). We find that, under the instant circumstances, defendant's dining room qualifies as a public place within the meaning of the statute. *See People v. Baus,* 16 Ill.App.3d 136, 138, 305 N.E.2d 592 (1973).

In *State v. Pallman,* 5 Conn.Cir.Ct. 202, 248 A.2d 589, 590 (1968), a Connecticut court upheld a conviction for indecent exposure where the defendant, who had been dispatched by his employer to repair a pump at an apartment, exposed himself to a nine-year-old boy in the bathroom of a private dwelling. On appeal, the defendant argued that "the state 'failed to prove that he . . . exposed himself in a public place or that he exposed himself in a private place where he was seen by more than one person or could have been seen by more than one person had he or she looked.' " *Id.*

The Connecticut statute proscribed wanton and indecent exposure, but the statute did not include a "public place" requirement. Therefore, the Connecticut court ruled: "It is enough if it be an intentional act of exposure, offensive to one or more persons. To hold otherwise would be to hold that one might commit with impunity any act of indecency, however gross, before any number of individuals successively." *Id.* at 592.

*United States v. Shaffer,* 46 M.J. 94 (1997), *cert. denied,* 522 U.S. 869, 118 S.Ct. 181, 139 L.Ed.2d 122 (1997), is also

instructive. There, the U.S. Court of Appeals for the Armed Forces addressed a Navy chief petty officer's challenge to his conviction for indecent exposure; the defendant had stood in his open garage while "completely naked." *Id.* at 96. The defendant argued that the evidence was not sufficient to support his conviction, however, because the evidence did not establish that his exposure was "wilful." *Id.* Upholding the conviction, the court stated:

[T]he fact that appellant's exposures took place in and on his private property is of no particular moment. *The offense of indecent exposure does not just apply to exposures that take place on traditionally public lands or in traditionally public buildings. The offense also applies to indecent exposures that occur in places "so public and open," including privately-owned homes, that they are "certain to be observed" by the general population.*

*Id.* at 96–97 (emphasis added).

Moreover, the court said, *id.* at 97:

In this case, evidence was adduced showing that appellant exposed himself while standing in his open garage (or next to his fence). The garage was attached to his home, faced the street, was large enough to hold two cars, and was located in a well-developed, residential community. School buses and automobiles drove by on a regular basis, and children routinely passed by on foot and on their bicycles. Other families' homes were located directly alongside of and across the street from appellant's home. From these facts, the panel could reasonably conclude that appellant's exposures took place in "public view." *See* para. 88b(1), Part IV.

Further, on each of these occasions, appellant was described as facing out of his open garage, towards the street, in unobstructed view, during daytime-lighted hours. Each time, he just stood there, naked. He never covered himself up or removed himself from view when seen. From these facts, the panel could reasonably conclude that appellant knew the garage was open and knew he could be seen by others. He was not, for example, merely reaching to place

something on a shelf. . . . Consequently, the panel could also reasonably conclude that, on each occasion, appellant was in the garage, or near it, for the sole purpose of exposing himself to the public.

*State v. Whitaker*, 164 Ariz. 359, 793 P.2d 116 (Ct.App.1990), is also informative. There, the defendant was charged with numerous counts of public sexual indecency involving a minor and public sexual indecency. *Id.* at 117. The indictments alleged that the incidents occurred in various places, including the bedroom and living room of the defendant's home. *Id.*

Prior to trial, Whitaker moved to dismiss the charges related to his living room, arguing that a person's private home is not a "public place" and, alternatively, if it is, the public sexual indecency statute is unconstitutional as vague and ambiguous because it regulates protected activity. *Id.* The state countered that the term "public" refers to the presence of another person and not to the place where the act occurred. *Id.* The trial court held that the public sexual indecency statute could not reasonably be construed to encompass activities within a private residence. *Id.*

In reversing, the court analyzed the common law tradition of the crime of public indecency. It noted that, as codified, Arizona had modified the meaning of "public place." [6] The court concluded that, in order to commit the offense, the indecent act need not be done in a place open to the public, so long as the act occurred in the presence of another person. *Id.* at 118. The court added, *id.* at 120:

It is therefore clear that the statute's proscriptions can be committed in one's own home. It is a question of fact whether an actor by his conduct knowingly exposes his activity to another and is reckless about whether such other

---

6. Arizona Revised Statute § 13–1402(A) states:

A. A person commits indecent exposure if he or she exposes his or her genitals or anus or she exposes the areola or nipple of her breast or breasts and another person is present, and the defendant is reckless about whether such other person, as a reasonable person, would be offended or alarmed by the act.

would reasonably be offended or alarmed by such activity. Any constitutional considerations concerning the right to privacy and consensual acts in the home are guarded by the standard of reasonableness and the requirement that the actor must be reckless.

The offense parallels indecent exposure in new A.R.S. § 13–1402 in requiring that another person be present and that the defendant be reckless about whether this other person normally would be offended or alarmed. This reasonableness test presumably balances interests of free expression and privacy with a standard of public moral decency.

*See also State v. Sousa*, 2 Conn.Cir.Ct. 452, 201 A.2d 664 (1964) (upholding conviction for indecent exposure when, in front of a window in his residence, the defendant masturbated); *State v. Dubois*, 58 Wash.App. 299, 793 P.2d 439 (1990) (upholding conviction for indecent exposure when defendant appeared naked in front of teenaged babysitter; court noted that the legislature intended to prohibit indecent exposure in public and private places when it removed the requirement of exposure in a public place and changed the name of the crime from public indecency to indecent exposure).

Appellant's position finds support in at least three jurisdictions. In *Washington v. Sayler*, 36 Wash.App. 230, 673 P.2d 870 (1983), the court determined that the facts were insufficient to sustain a conviction for an exposure in a public place. The case involved a defendant who masturbated in front of two boys while in his garage. Noting that "public" does not mean "private," the court stated, *id.* at 873:

> We believe it appropriate in interpreting a statute to use simple logic and to give ordinary English words their ordinary meaning. . . . Webster tells us that "public" means "1. a place accessible or visible to all . . ." "open" means "2a: completely free from concealment: exposed . . ." and "expose" means "2: to lay open to view . . ." *Webster's Third New International Dictionary* (Merriam 1969) . . . [t]hus,

the forbidden conduct is public conduct, and public, in the context, must refer to place.[ ]

However, the State of Washington amended its statute in 1987 to address the factual scenario in *Sayler*. As revised, the statute defined public indecency as "any open and obscene exposure of his person ... knowing that such conduct is likely to cause reasonable affront or alarm." *State v. Chiles*, 53 Wash.App. 452, 767 P.2d 597, 598 n. 1 (1989). But, the statute did not define "public place." *Id.* at 599.

Thereafter, the Washington court decided *Chiles*, 53 Wash. App. 452, 767 P.2d 597. In that case, the court considered whether the defendant's indecent exposure in his home, in front of a window from which he was visible to pedestrians walking on the public sidewalk, constituted conduct in a "public place" within the meaning of the statute then in effect. *Id.* at 597. The court distinguished *Sayler*, cited *Messina*, 212 Md. 602, 130 A.2d 578, and said, *id.* at 599, 130 A.2d 578:

Indecent exposure at common law consists of exposure in public of the entire person or of parts that should not be exhibited. Exposure is in a public place if it occurs at a place open or exposed to the view of the public. The public place provision of the common law offense is not inconsistent with the statute. Here, the record clearly establishes that the defendant indecently exposed his person to the view of passersby walking along a public thoroughfare. These facts satisfy the statutory requirement of former RCW 9A.88.010, as interpreted by *Sayler*, that the indecent exposure must occur in a public place.

In *State of Washington v. Dubois*, 58 Wash.App. 299, 793 P.2d 439 (1990), the court construed the meaning of Wash. Rev.Code Ann. § 9A.88.010, and said, *id.* at 442:

In this case, the final committee report on Senate Bill 6012, which amended RCW 9A.88.010, referred to *Sayler* and acknowledged that in light of that decision, it was unclear whether or not indecent exposure could be committed in a private place. In response, the Legislature removed the word "public" from the title of the statute....

[I]t is apparent that the Legislature intended to make it possible to indecently expose oneself in a private place.

Wisneski relies on *State v. Romero*, 103 N.M. 532, 710 P.2d 99 (Ct.App.), *cert. denied*, 103 N.M. 525, 710 P.2d 92 (1985). There, the defendant exposed himself to his girlfriend's minor daughter while in the living room of his home, and to her other minor daughter while in the kitchen of his home. He was convicted of two counts of indecent exposure, but the court reversed. The statute barred indecent exposure to "public view," but did not define "public view." *Id.* at 101. The court concluded that the conduct did not take place in "public view," as required by the statute, because it was not "perpetrated in a place accessible or visible to the general public," so as to "come within the ambit of proscribed criminal behavior." *Id.* at 103.

Appellant also relies on *Long v. State*, 666 N.E.2d 1258 (Ind.Ct.App.1996). There, the defendant was charged with public indecency after police officers observed her dancing in the nude, on stage, at an alcohol-free club. *Id.* at 1259. The club was open for membership to persons eighteen years or older, and charged a nominal annual membership fee of $1.00. On appeal, the defendant argued that the establishment was a private club, and therefore it was not a "public place" for purposes of the State's public indecency statute. The statute did not define "public place." *Id.* at 1260.

The Indiana court observed that a private residence is not a public place, nor does the "mere assemblage" of persons "convert private property into a public place . . . ." *Id.* at 1261. It defined "a public place" as "any place where members of the public are free to go without restraint." *Id.* Because the court was of the view that any restrictions on access to the club were "illusory," it held that the club was a public place. *Id.* The court reasoned that the nudity occurred in a public place because the club "is open to the public and patrons are able to enter at will." *Id.* at 1262. The court added: "While private areas may exist within a public establishment, Long's actions did not occur in a private area between two consenting

adults. Her actions occurred before an assemblage of people, and although they apparently desired to see her performance, the State has a valid interest in prohibiting activities considered immoral." *Id.*

With the cases discussed above in mind, we return to the case *sub judice.* Under appellant's analysis, the crime of indecent exposure cannot occur, by definition, in a private residence of a third party or at a place that is not generally open to the public at large.

The word "public" has many definitions. The first definition in *Merriam–Webster's Collegiate Dictionary* 1005 (11th ed. 2004) defines "public" as an adjective, as follows: "1a: *exposed to general view;* open...." (Emphasis added). As a noun, "public" is defined as follows: "1a: place accessible *or visible* to the public...." (Emphasis added). Therefore, for purposes of the common law definition of the offense of indecent exposure, it would seem that, if appellant exposed himself to "general view" by standing directly in front of a window, from which he was "visible" to others, his conduct would have occurred in a "public place."

In the light most favorable to the State, the evidence established that appellant exposed himself in the home of a third party, when it was still daylight, and while in a room that had a "big window pane." The State contends in its brief that appellant was "positioned across from 'the big window pane'" in the trailer. Yet, at trial, the State failed to elicit any facts pertaining to appellant's precise location in regard to the window or the visibility of appellant, through the window, to those outside Ms. Penfield's home. Indeed, the State did not establish the size of the window; it did not show whether the window was covered by curtains or blinds; and it did not indicate the proximity of appellant to the window at the relevant time. Nor did it show that the window faced an area accessible or visible to others. Given the dearth of evidence as to appellant's proximity to the window when he exposed himself, and the lack evidence as to important features of the window, we are of the view that the jury would not have been

able to infer that persons outside Ms. Penfield's home would have been able to see Wisneski's exposure of his genitals.

Nevertheless, even if the evidence was not sufficient to show that appellant was visible from the window to members of the public outside the trailer home, we are satisfied that, based on the facts of this case, his conduct amounted to indecent exposure. We explain.

 There is no dispute that, when appellant was a guest in a private home, he exposed himself to three people, none of whom were members of his family or members of his household. It is also uncontroverted that Wisneski was not in an area of the home that is generally regarded as private, such as a bedroom or bathroom. Moreover, it is clear that appellant intentionally exposed himself to the other two invitees and the host without their permission or consent. Put another way, this is not a case in which the accused inadvertently exposed his genitals while in the privacy of a residence or building, such as by carelessly changing clothes in front of a window or by walking around nude in front of his family while in his own home.

Because appellant did not expose himself within the confines of his own home, we need not determine whether his conduct would have been illegal had he exposed himself while in his own home. Moreover, we underscore that appellant's conduct was not consensual; clearly, while appellant was a guest in Ms. Penfield's home, he did not have permission from her or the others to engage in such lewd behavior. And, in our view, society is not prepared to recognize his behavior as acceptable. *See* J. B. B., *Note,* 33 MICH. L. REV. 936, 937 (1935) ("Both at common law and under the statutes prohibiting indecency, it is believed that the sole purpose [of the crime of indecent exposure] is to protect public morals by preventing acts which shock the sense of decency of the community, or which tend to lower the moral standards.[1]")

 As the *Messina* Court said, 212 Md. at 605, 130 A.2d 578, "What constitutes a public place within the meaning of this offense depends on the circumstances of the case." Un-

der this circumstances of this case, in which appellant was a guest in the residence of another and, while in an area of the home not traditionally regarded as private, he intentionally exposed himself to others, we are satisfied that his conduct constituted indecent exposure in a "public place." We do not construe the definition of "public place" so narrowly as to apply solely to places that are physically located outdoors or open to the public at large, without any restriction. Looking again to the dictionary definitions cited earlier, appellant's unsolicited conduct was public in the sense that it occurred in the open and was observed by others.

## II.

Appellant contends that the trial court abused its discretion by "permitting the State to reopen its case to introduce stipulated evidence." He notes that, before the State rested, "the prosecutor had every opportunity to introduce the stipulations relating to Counts I and II into evidence. . . ." Therefore, he insists that "[t]he court erred when it permitted the [S]tate to reopen without first finding that the State's omission was in good faith, and because it did not consider whether allowing this evidence out of order would impede Wisneski's right to a fair trial."

Although appellant concedes that the trial court has "broad discretion in allowing evidence out of order, including to permit the moving party to reopen its case in chief," he avers that such a decision must "not impair the ability of the defendant to answer and otherwise receive a fair trial." Relying on *Collins v. State*, 373 Md. 130, 816 A.2d 919 (2003), appellant suggests that, before the court allows a party to introduce evidence out of order, it must "consider several factors." These include, *inter alia*, " 'whether good cause is shown' by determining the intention of the State in withholding the proposed evidence, specifically, 'whether there is a good faith, or at least, reasonable, basis for withholding the evidence.' " (Citation omitted). Appellant adds:

Whether the State neglected to present the stipulation through inattention, or through the mistaken belief that the stipulation did not have to be presented to the jury, the trial court should have considered whether the State's lack of preparation constituted good faith. It should also have considered the possible effect on Wisneski's right to a fair trial by unduly emphasizing the stipulation to the jury.

According to appellant, "even if the trial court determines that good faith existed and warrants granting leave to reopen, it is further required to place on the record the basis for its ruling to demonstrate that it has in fact considered the factors set forth in *Collins.*" In this case, complains appellant, it is not clear that the trial court did so, "because it did not give a basis for its decision."

In response, the State argues that "the trial court properly exercised its discretion in allowing the State to enter a stipulation into evidence after it had rested its case-in-chief and before defense evidence was presented." It observes: "There is '[o]rdinarily ... no abuse of discretion in permitting the State to reopen its case for the purpose of proving important or even essential facts to support a conviction.'" (Citation omitted). In addition, the State suggests that "the trial court was not required to spell out the basis for its decision," because "it was clear that the prosecutor ... made an honest mistake in neglecting to enter the stipulation into evidence," and "the timing of the stipulation would in no way prejudice Wisneski."

To be sure, a trial court has broad discretion in allowing evidence out of order, and may permit the State to reopen its case in chief, "'so long as [it] does not impair the ability of the defendant to answer and otherwise receive a fair trial.'" *Collins v. State,* 373 Md. 130, 142, 816 A.2d 919 (2003) (citation omitted) (upholding the trial court's ruling, which granted the State's request to reopen its case when an eyewitness in a murder case had been located); *see Ware v. State,* 360 Md. 650, 684, 759 A.2d 764 (2000), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001); *Wright v. State,* 349 Md.

334, 341, 708 A.2d 316 (1998); *Dyson v. State*, 328 Md. 490, 502, 615 A.2d 1182 (1992); Md. Rule 5-611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment").

Writing for this Court in *Cason v. State*, 140 Md.App. 379, 780 A.2d 466, *cert. denied*, 367 Md. 89, 785 A.2d 1292 (2001), and *cert. denied*, 370 Md. 269, 805 A.2d 265 (2002), Judge Deborah Eyler explained:

> In general, the court has "broad discretion to reopen a case to receive additional evidence." *Dyson v. State*, 328 Md. 490, 500, 615 A.2d 1182 (1992); *see also Spillers v. State*, 10 Md.App. 643, 649, 272 A.2d 49 (1971) (stating that "[o]rdinarily, there is no abuse of discretion in permitting the State to reopen its case for the purpose of proving important or even essential facts to support a conviction. . . .") The critical issue in determining whether a court abused its discretion in reopening the case is whether its doing so "impaired the ability of the defendant to answer and otherwise receive a fair trial." *State v. Booze*, 334 Md. 64, 76, 637 A.2d 1214 (1994), *subsequent appeal at* 111 Md.App. 208, 681 A.2d 534 (1996), *rev'd on other grounds*, 347 Md. 51, 698 A.2d 1087 (1997).
>
> Usually, whether the reopening of evidence impaired the defendant's ability to receive a fair trial "is answered by reference to the State's intention in withholding the evidence, *i.e.*, whether it did so in order to gain an unfair advantage from the impact later use of the evidence likely would have on the trier of facts, the nature of the evidence, and its relationship to evidence already in the case." *Id.* (citing *State v. Hepple*, 279 Md. 265, 271, 368 A.2d 445 (1977)). In exercising its discretion, the court
>
>> "must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact

on the trier of facts. To this end the judge must see whether the proposed evidence is merely cumulative to, or corroborative of, that already offered in chief or whether it is important or essential to a conviction." [*Hepple v. State,* 31 Md.App. 525, 534, 358 A.2d 283 (1976), *aff'd, State v. Hepple,* 279 Md. 265, 368 A.2d 445 (1977)]. Other factors which have been identified as important to the assessment of the propriety of the trial court's exercise of discretion to vary the order of proof include:

"Whether good cause is shown; whether the new evidence is significant; whether the jury would be likely to give undue emphasis, prejudicing the party against whom it is offered; whether the evidence is controversial in nature; and, whether the reopening is at the request of the jury or a party." *Dyson v. State,* 328 Md. 490, 615 A.2d 1182 (1992).

*Id.* at 390–92, 780 A.2d 466 (alterations in *Cason*).

Applying the considerations outlined in *Cason,* we discern no abuse of discretion here. There was no evidence that the State withheld the stipulation for tactical advantage. To the contrary, the State mistakenly thought the stipulation was already on the record. And, as the State observes, the stipulation was entered "for Wisneski's benefit, i.e., so that the jury would not hear additional evidence regarding his prior convictions." Moreover, the reopening of the State's case certainly did not impair the ability of Wisneski to respond or otherwise impede his right to a fair trial. Indeed, given that the matter concerned a stipulation, appellant obviously agreed with the content and was not surprised by it. Finally, from the jury's viewpoint, the stipulation was not presented out of the normal order, because the court read it to the jury at the end of the State's case. Therefore, it was not unduly highlighted.

In addition, we are unpersuaded by appellant's argument that the trial court abused its discretion by failing to include its rationale on the record. A trial court is presumed to know the law and apply it properly. *State v. Chaney,* 375

Md. 168, 181, 825 A.2d 452 (2003). Nor must a trial court spell out every step in weighing the considerations that culminate in a ruling. *Streater v. State,* 352 Md. 800, 821, 724 A.2d 111 (1999).

Wisneski's reliance on *State v. Booze,* 334 Md. 64, 637 A.2d 1214 (1994), is misplaced, because the facts of that case are totally dissimilar to those of the case at bar. *Booze* involved the propriety of the State reopening its case in the rebuttal stage of trial, and revolved around the "critical issue" of "whether the reopening of the State's case impaired the ability of the defendant to answer and otherwise receive a fair trial." *Id.* at 76, 637 A.2d 1214. The Court of Appeals held that the defense was impaired by the trial court's decision to allow the State to call a previously undisclosed witness, about whom it had known, to help contradict a favorable inference that had been raised in the defense case.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**